DOUGLAS R. DANIELS ET AL. *v.*
HONORABLE JON M. ALANDER
(AC 22542)

Foti, Dranginis and Flynn, Js.

Argued October 24, 2002—officially released April 1, 2003

*Kenneth A. Votre*, for the appellant (plaintiffs in error).

*Gregory T. D'Auria*, associate attorney general, with whom were *Karla A. Turekian*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant in error).

*Opinion*

FOTI, J. This case is before us on a writ of error brought by the plaintiffs in error, Douglas R. Daniels and Dennis Driscoll, both of whom are members of the bar of this state. The plaintiffs claim that the defendant in error,[1] the Honorable Jon M. Alander, improperly

---

[1] In this opinion, we refer to the defendant in error interchangeably as the trial court and Judge Alander.

reprimanded them for having violated subsections (a) (1) and (d) of rule 3.3 of the Rules of Professional Conduct during a proceeding before him in the Superior Court. On appeal, the plaintiffs claim that (1) the evidence did not support the trial court's factual findings and that its legal conclusions were improper, and (2) the court violated their due process rights by failing to give them adequate notice of the purpose of its misconduct hearing. We find no error.

The record discloses the following facts and procedural history. On January 16, 2001, the plaintiffs, both of whom were practicing law in Daniels' law firm, filed an ex parte application for temporary custody and relief from abuse on behalf of Ines Montalvo. Judge Alander conducted an ex parte hearing on the matter on that same date. The application sought an order awarding Montalvo temporary custody of her two minor children as well as an order restraining the children's father, Felipe Nieves, from threatening or assaulting the children or entering Montalvo's Connecticut residence. The application alleged that the children had been abused physically by Nieves and that they feared returning to his care in New Jersey. See *Montalvo* v. *Nieves*, Superior Court, judicial district of New Haven, Docket No. 447041 (April 9, 2001) (29 Conn. L. Rptr. 352).

The application also alleged that an action was pending in the New Jersey Superior Court to resolve outstanding issues of custody and visitation. During the hearing on Montalvo's application, Daniels indicated that Montalvo had retained legal representation in New Jersey, that a full trial on the issue of the children's custody had taken place in the New Jersey Superior Court and that Montalvo was awaiting the decision in that matter. Nonetheless, Daniels argued on behalf of Montalvo that apart from the pending New Jersey mat-

ter, judicial intervention was warranted to protect the children from an immediate threat from Nieves.[2]

At the hearing, the court inquired directly of Montalvo and Daniels as to why it should issue the order. Central to the court's line of inquiry was why Montalvo did not file her application before the Superior Court in New Jersey, which already had conducted a hearing on the issue of the children's custody. Montalvo testified that she did not want to file the emergency application in New Jersey because she feared that it would endanger the immediate physical safety of the children. The court inquired directly of Daniels as to why he chose to pursue the application in Connecticut rather than to pursue it before the New Jersey trial judge who had presided over the custody trial, the Honorable John A. Peterson, Jr. In response to the court's questioning, Daniels represented that his colleague, Driscoll, "spoke to [Montalvo's] counsel in New Jersey and it was her opinion that we should not do it in New Jersey for a number of reasons, none of which I think are flattering to the judiciary there, but we were relying on that."

Judge Alander recessed the hearing on the application and spoke via telephone with Judge Peterson in New Jersey. Judge Peterson agreed to conduct a hearing on Montalvo's application for temporary emergency custody on January 19, 2001, and Judge Alander issued a temporary emergency order awarding Montalvo custody of the children until that time. Judge Alander noted that both he and Judge Peterson believed that New Jersey was the appropriate forum in which to resolve the matter.

After the hearing, Judge Alander received a letter from Veronica Davis, the attorney who was represent-

---

[2] Montalvo brought her application under the Uniform Child Custody Jurisdiction and Enforcement Act, now codified in General Statutes § 46b-115 et seq.

ing Montalvo in the custody proceeding in New Jersey. Davis informed the court that she had reviewed the transcript of proceedings of January 16, 2001, and that some of the representations made by Daniels during the hearing were false. By means of a letter dated February 5, 2001, Judge Alander informed Davis, as well as the plaintiffs, that he wanted to conduct a hearing in regard to Davis' allegations and that such hearing would enable him to determine if further action was warranted.

On March 16, 2001, the court conducted a hearing related to Davis' allegations. Davis testified that Daniels had misrepresented her opinion about bringing the application before Judge Peterson in New Jersey. The court also heard testimonial evidence from Daniels, Driscoll and Montalvo. On April 9, 2001, the court issued a memorandum of decision in which it concluded that the plaintiffs had violated subsections (a) (1)[3] and (d)[4] of rule 3.3 of the Rules of Professional Conduct. The court reprimanded the plaintiffs for their conduct. The plaintiffs thereafter filed a motion to reargue, which the court denied. The plaintiffs, pursuant to Practice Book § 72-1 et seq., thereafter filed the present writ. Our Supreme Court, pursuant to Practice Book § 65-1, transferred the appeal to this court.

I

The plaintiffs first challenge the court's factual and legal determinations. They claim that (1) the evidence did not support the court's findings of fact and (2) as

---

[3] Rule 3.3 (a) of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not knowingly . . .

"(1) Make a false statement of material fact or law to a tribunal . . . ."

[4] Rule 3.3 (d) of the Rules of Professional Conduct provides: "In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse."

a matter of law, the court's factual findings did not support its legal conclusions. We disagree.

As a preliminary matter, we set forth our standard of review. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made. . . . Additionally, because the applicable standard of proof for determining whether an attorney has violated the Rules of Professional Conduct is clear and convincing evidence . . . we must consider whether the trial court's decision was based on clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 322–23, 796 A.2d 516 (2002).

For organizational purposes, we will review separately the court's determinations as to the plaintiff Daniels and the plaintiff Driscoll.

## A

### Plaintiff Daniels

#### 1

#### Violation of Rule 3.3 (a) (1)

In its memorandum of decision, the court cited a statement that Daniels made to the court during the January 16, 2001 ex parte hearing. During the hearing,

the court asked Daniels why he was bringing the application in Connecticut rather than in New Jersey. Daniels stated: "Mr. Driscoll spoke to counsel in New Jersey, and it was her opinion that we should not do it in New Jersey for a number of reasons, none of which are flattering to the judiciary there, but we are relying on that."

The court found that Daniels and Driscoll "both knew that attorney Davis believed that no emergency application for temporary custody should be brought at all, but that if one were brought, she believed . . . that, if necessary, she was prepared to file such an application in New Jersey." The court also found that Davis conveyed her opinion on the subject of bringing an application directly to Driscoll, who then relayed her opinion to Daniels.

Davis testified that before the hearing, she spoke with Driscoll via telephone about the issue of filing the application. She testified: "I spoke with [Montalvo], and I emphatically told her that New Jersey had jurisdiction over this issue. And that if she wanted to go in on an emergency matter, that it had to be done in the state of New Jersey. And I told attorney Driscoll that over the phone, that New Jersey had jurisdiction over this issue." Davis further testified that as evidence of the intent that she conveyed to Driscoll and Montalvo, she had the legal documents necessary to proceed on Montalvo's behalf prepared on the evening of January 15, 2001, before she learned that Montalvo had taken legal action in Connecticut. Davis testified that Daniels had attributed things to her that she simply had not stated, that she had conveyed her willingness to file an application in New Jersey and that she was "offended" by Daniels' statement that she had said something derogatory about the New Jersey judiciary.

Daniels argues that the evidence did not support the court's finding that he knowingly made a false statement

of material fact. It is axiomatic that as part of its fact-finding function, the court was free to believe Davis' testimony, in whole or in part. *Aetna Casualty & Surety Co.* v. *Pizza Connection, Inc.*, 55 Conn. App. 488, 498, 740 A.2d 408 (1999).

On appeal, the plaintiffs in their principal brief argue that Daniels' statements were not truly false, but that they simply "reduced attorney Davis' opinion to the barest of functional terms." Daniels also posits that his characterization of Davis' opinion was "true insofar as it goes." The court's factual findings permitted it to conclude that the statements were false for purposes of rule 3.3 (a) (1) because they did not convey Davis' true opinion as to the subject of the court's inquiry.

The comment to rule 3.3 states that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation. . . ." When Daniels, in response to a specific inquiry from the court, represented Davis' opinions regarding bringing an application in New Jersey, he was obligated to respond to the inquiry completely and not in a misleading manner. On the basis of Davis' testimony, the court reasonably could have concluded that Daniels had made an affirmative misrepresentation.[5]

---

[5] The dissent argues that there was no "clear and convincing evidence that Daniels or Driscoll misrepresented the truth." In that regard, the dissent points out that "Daniels' representation was that the application for emergency relief *should* not be brought in New Jersey, not that the New Jersey attorney *would* not bring the case in New Jersey or that the case *could* not be brought in New Jersey." (Emphasis in original.) The dissent also states that "[Daniels'] statements clearly were not an attempt to repeat verbatim the conversations between Driscoll and Davis. It was clear that Daniels paraphrased only a small portion of the conversations, and he did not imply in any way that that was all that was said."

As we previously stated, a misrepresentation can take the form of an affirmative statement, and it also can take the form of a failure to disclose. Rules of Professional Conduct 3.3, comment. We note simply that the court, in its fact-finding role, was the arbiter of credibility. The court believed Davis' testimony as to what she had told Driscoll. Those factual findings are critical to the outcome of this case, and we are unable to disturb them

Daniels also argues that the challenged statement did not relate to a material fact. We disagree. "Material" is defined as "having real importance or great consequences . . . ." Merriam-Webster's New Collegiate Dictionary (10th Ed. 1995). Our Supreme Court, albeit in a different context, has stated that an "issue of fact is 'material' in the sense that it would make a difference in the result." *United Oil Co.* v. *Urban Redevelopment Commission*, 158 Conn. 364, 382, 260 A.2d 596 (1969). Essentially, the plaintiffs argue that Daniels' statements about Davis' opinion were not material because Davis' opinion should not have had a bearing on the court's decision to grant the application.

Davis' opinion was material, and it was important to the court's decision, when the court made it a subject of its inquiry. The record of the court's colloquy with Daniels as to the proper forum in which the application should be heard belies any attempt of the plaintiffs to argue that Daniels' statement was immaterial. Daniels did not make an off-the-cuff remark unrelated to the subject at hand or not responsive to the court's concerns; his statement came in response to an inquiry from the court as it considered whether the application before it was in the proper forum.

The court possessed temporary emergency jurisdiction to modify the child custody determination made by the court in New Jersey by virtue of General Statutes § 46b-115n after it found the conditions set forth therein to have been present. Under General Statutes § 46b-115q, however, the court had the option of declining to exercise its jurisdiction if it determined that Connecti-

---

because there is no evidence to suggest that they are clearly erroneous. The court, having witnessed the proceedings firsthand, further found that Daniels' failure to relate fully Davis' position constituted an affirmative misrepresentation. The court did not find that Daniels harmlessly omitted crucial facts in the course of paraphrasing Davis' conversation with Driscoll, and we will not do so.

cut was "an inconvenient forum under the circumstances and that a court of another state [was] a more appropriate forum. . . ." Section 46b-115q also provides that the court, on its own motion, may raise the issue of inconvenient forum. Contrary to the plaintiffs' assessment of how the court chose to evaluate the application before it, it was entirely appropriate for the court to exercise its authority over the proceeding by considering the issue of the proper forum. Furthermore, Daniels' statement was one of material fact because it was important to the court's resolution of that issue and was relevant to the issue of whether it was a convenient forum.[6] We note further that the court stated in its

---

[6] The dissent states that "whether a client's joint, out of state counsel should, could or would proceed in the sister state is not" a proper subject of the court's inquiry under General Statutes § 46b-115q (b). It follows, according to the dissent, that a misrepresentation related to such an inquiry is not material. We disagree.

The court's inquiries as to why Montalvo and her New Jersey counsel were not pursuing the application in New Jersey was a proper subject of the court's inquiry under § 46b-115q (b). Contrary to the dissent's view of the inquiry itself, it is difficult to see how the court's questions and counsel's answers thereto would not relate to several of the factors, *which are not exclusive*, enumerated in § 46b-115q (b). If Daniels represented, for instance, that Davis had informed him or Driscoll that Davis did not want to file the application in New Jersey because Montalvo had engaged in a pattern of filing frivolous applications or that she did so every other week for no better reason than to seek favorable custody orders in jurisdictions other than New Jersey, would not such information have been relevant to the court's decision as to whether violence had occurred and whether it needed to protect the children? Such inquiry also could elicit information related to the issues of which state's courts were more familiar with the pending litigation, which forum could resolve the issue expeditiously and which forum would have superior access to the evidence necessary to resolve the issue before it.

Here, Daniels failed to disclose that Davis believed that New Jersey had jurisdiction over the matter, that she was prepared to bring the application in New Jersey and that she already had drafted the legal documents necessary to do so. That information was material and relevant to the court's decision-making process under § 46b-115q as the court attempted to resolve the issue of whether circumstances as a whole warranted a conclusion that it was appropriate for the Connecticut court to exercise jurisdiction to effectuate the purposes of the act. The issue was not merely whether the

memorandum of decision that the misrepresentation affected its decision on the application.[7]

Daniels also claims that there was no evidence on which the court could have found that he knowingly misrepresented Davis' opinion because there was no evidence that he knew any more about Davis' conversation with Driscoll than what he had informed the court.

court had jurisdiction; it also was whether the court would serve the interests of the children best by exercising jurisdiction. It was the preliminary finding that § 46b-115q required the trial court to make prior to evaluating the timeliness and veracity of the claim of abuse and allowing a new jurisdiction to enter temporary emergency orders.

It is difficult to see how the existence of an attorney, ready and willing to act, in the state that was already exercising its jurisdiction over the issue of custody would not be relevant to the question of whether circumstances warranted an exercise of jurisdiction in this forum. Daniels, however, did not relate that information. Instead, he chose to portray Montalvo's New Jersey counsel as unwilling to act. He did so, presumably knowing that the court was interested in knowing Davis' position and that the court believed that it was important to its analysis.

The dissent posits that the court's exercise of jurisdiction was "not dependent on whether another state had exercised jurisdiction or the applicant has an attorney in another state or what that attorney's opinion is." We agree. The test, however, for determining whether the misrepresentation was material for purposes of the rules of professional conduct does not hinge on whether the facts misrepresented necessarily would have been dispositive of the matter before the court. That view of materiality is too narrow. In the present case, the court, seeking to learn as much information as it could about the emergency application, chose to inquire as it did. The court's inquiry related to the matter before it and, specifically, to the issue of whether Connecticut was a convenient forum for the application. Under those circumstances, counsel's misrepresentations in response to direct questions from the court were material.

[7] The court stated as follows: "Had I known at the time of the ex parte proceeding the accurate and complete opinions of attorney Davis—that she believed that New Jersey had jurisdiction over any application for temporary custody, that New Jersey was the appropriate forum to file such an application and that she was prepared to file an emergency custody petition in New Jersey, I would have instructed the plaintiff to file her application for temporary custody in New Jersey and not have granted the emergency application providing temporary custody of the two minor children to the plaintiff. Fortunately, I only awarded custody to the plaintiff for four days and arranged to have the hearing on custody heard that same week in New Jersey. As a result, the harm was not as great as it could have been."

Stated otherwise, Daniels argues that he merely related what Driscoll told him, irrespective of what Davis might have actually told Driscoll. He points out that the only evidence in the record on that issue is Driscoll's testimony. Driscoll testified that Davis had told him that she had advised Montalvo not to proceed with the application in New Jersey because she believed that the filing would have angered Judge Peterson and that it would have compromised Montalvo's custody trial. Driscoll testified that he reported "that conversation" to Daniels. Daniels now argues that on the basis of that testimony, the court had no basis on which to find that Driscoll had told Daniels "the content of his conversation with attorney Davis" and, therefore, that he knowingly had made a false statement.

At the hearing on the application, the court heard Daniels' representation that Driscoll had spoken with Davis. Daniels then spoke about the substance of what Davis had conveyed to Driscoll on the topic of bringing the application in New Jersey. Daniels and Driscoll were attorneys in the same law firm, and Driscoll was present in the courtroom when Daniels was recounting the substance of Davis' position. It is uncontroverted that Driscoll conversed with Davis, and that Driscoll and Daniels had discussed the content of that conversation. The court was free to disbelieve Driscoll's testimony and infer, on the basis of the circumstantial evidence before it, that Driscoll had told Daniels what the court found that Davis had told Driscoll.

A fact finder is not free to disbelieve uncontradicted testimony and simply to conclude that the opposite of that testimony is true, especially where there is no evidence to justify that conclusion. See *Builders Service Corp.* v. *Planning & Zoning Commission,* 208 Conn. 267, 292–93, 545 A.2d 530 (1988); *Martino* v. *Grace-New Haven Community Hospital,* 146 Conn. 735, 736, 148 A.2d 259 (1959). Such concerns are not

implicated here. In the present case, ample circumstantial evidence supports the court's findings.

For those reasons, we conclude that clear and convincing evidence supported the court's findings and that its legal conclusion, that Daniels violated rule 3.3 (a) (1), was legally and logically correct.

2

Violation of Rule 3.3 (d)

The court further found that during the hearing on the application, Daniels had "failed to [inform the court] that attorney Davis believed that New Jersey had jurisdiction in this matter and that New Jersey, not Connecticut, was the appropriate forum for filing such a petition. He also neglected to inform [the court] that it was attorney Davis' opinion that no emergency petition should be filed at all. Finally, he did not tell [the court] that, despite her reservations, attorney Davis was prepared to file an emergency petition on Ms. Montalvo's behalf in New Jersey."

The court concluded that those failures deprived it of a "complete picture of the opinions of attorney Davis as they related to the appropriate forum for bringing an emergency petition in this case." The court further concluded, as a matter of law, that those failures violated rule 3.3 (d).

We first conclude that clear and convincing evidence supported the court's factual findings. The court heard Davis' testimony that Daniels "totally misrepresented" her opinions concerning the application. Davis testified in that regard that it was her opinion that New Jersey had jurisdiction over Montalvo's case, and that she "absolutely" had told Driscoll and Montalvo that she was prepared to proceed on Montalvo's case in that forum.

We also find that the court logically concluded that Daniels' failure to disclose accurately what he knew about Davis' position on the matter violated rule 3.3 (d). That rule applies to ex parte proceedings, which was the type of proceeding in this case. The rule obligated Daniels to "inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse."

Daniels reiterates his argument that he had no duty to disclose accurately his knowledge of Davis' opinion because such opinion was not material. For the reasons previously discussed, we again reject that argument. It is clear that the court inquired of Daniels about the prospects of bringing the action in New Jersey, rather than in Connecticut, because it was concerned that Connecticut might be an improper forum. Facts material to the issue of why the application was not being filed in New Jersey certainly included Davis' position in regard to filing an application in that state. Even if Daniels did not believe that he needed to disclose such facts to the court, it belies logic for him to argue that he was not aware that the court sought such information at the hearing or that he was not under a duty to disclose such information once the court made the issue of the proper forum a subject of its inquiry.

## B

### Plaintiff Driscoll

#### 1

##### Violation of Rule 3.3 (a) (1)

The court found that after Driscoll had learned of Davis' opinion that the application should be filed, if at all, in New Jersey, and that she was willing to do so, he failed to correct Daniels' false statement concerning

Davis' opinion when it was made to the court in his presence.

We already have concluded in part I A that the evidence supported the court's findings that (1) Davis told Driscoll that she believed that New Jersey had jurisdiction over the matter and that she would be willing to file an application in New Jersey, (2) Driscoll conveyed that conversation to Daniels and (3) Daniels falsely conveyed that conversation to the court.

We likewise conclude, therefore, that the evidence supports the court's finding that Driscoll knew of Davis' opinion concerning the filing of the application; he had spoken directly with Davis. The record also reflects that Driscoll was present at the January 16, 2001 hearing on the application and, as the parties do not argue otherwise, was within earshot of Daniels' responses to the court's inquiry about the conversation that Driscoll had with Davis. Accordingly, Driscoll was aware of Daniels' statement.

The court legally and logically concluded that Driscoll's actions violated rule 3.3 (a) (1). The record reflects that Daniels and Driscoll both appeared on Montalvo's behalf at the January 16, 2001 hearing on the application. When the hearing began, Driscoll introduced himself to the court on Montalvo's behalf, but Daniels addressed the court for the remainder of the hearing. It is clear from the colloquy between Daniels and the court that Daniels was, essentially, speaking for himself and for his cocounsel, Driscoll. When the court inquired of Daniels why Montalvo was not filing her application in New Jersey, Daniels replied, in part, by recounting the details of the conversation between Driscoll and Davis. Driscoll remained silent while Daniels recounted details about Driscoll's telephone conversation with Davis. We know of no impediment that prevented Driscoll, counsel appearing on behalf of the

movant in an ex parte proceeding, from correcting any alleged misstatement that Daniels made to the court concerning a conversation that he had with Davis.

Driscoll argues, essentially, that his failure to act is beyond the reach of rule 3.3 (a) (1) because he did not make a direct statement to the court, and "[t]here is no duty imposed [on him] to correct attorney Daniels' statement. We disagree.

Rule 3.3 is entitled "Candor toward the Tribunal." It codifies the obligation of attorneys to act with candor in all of their dealings with the court. That obligation is particularly strong when an attorney makes assertions, either in an affidavit or by way of a statement in open court, which purport to be based on his or her knowledge.

Although we observe, as did the trial court, that Driscoll did not actually utter the false statement to the court, we also observe that Daniels represented Driscoll's words to the court in his presence. Driscoll was not a bystander to the proceedings taking place on his client's behalf; he appeared before the court on Montalvo's behalf. Daniels spoke about Driscoll's knowledge, i.e., what Davis had told Driscoll. We conclude that under those circumstances, Driscoll would have upheld his duty of candor to the court by simply addressing the court himself to remedy the misstatement or by addressing his cocounsel and informing him to do so. Under Driscoll's interpretation of the rule, Driscoll, an officer of the court, would be free to do nothing while his cocounsel made any number of misstatements about facts that purportedly came, and under the circumstances of this case, could only have come, from his own personal observations and knowledge of events that occurred outside of the court's presence. Such conduct does not accord with an attorney's duty to deal fairly and candidly with the court, and it

belies the duty imposed by rule 3.3 (a) (1). Under those unique circumstances, we find the fact that Driscoll did not actually utter the falsity to the court to be of no consequence.

### 2

### Violation of Rule 3.3 (d)

The court also found that Driscoll had violated rule 3.3 (d) when he failed to inform the court of all material facts known to him to enable the court to make an informed decision.

Driscoll apparently argues that he had no duty to disclose Davis' representations to him because, in his view, such representations were not material facts in the court's inquiry "whether or not the court was interested in hearing them." For the reasons previously discussed, we find no merit in the argument that information about Davis' readiness to act on the matter in New Jersey was immaterial.

Driscoll, along with Daniels, appeared on Montalvo's behalf in the ex parte proceeding. Driscoll had the same duty as did Daniels to reveal all material facts to the court. Because Driscoll was well aware of the line of the court's inquiry into the reasons why the application was not brought in New Jersey, he was under a duty to inform the court of all material facts known to him in that regard. He failed to do so and, consequently, the court legally and logically concluded that Driscoll had violated rule 3.3 (d).

Before turning to the plaintiffs' next claim, we want to address a primary concern raised by the dissent, namely, that our holding today will have a "chilling effect on . . . the legal profession's duty to keep a client's confidences and to bring applications for emergency relief from child abuse in Connecticut." It is diffi-

cult to see how this decision will cause either of these unintended effects.

An application for temporary emergency relief underlies the present dispute. The dissent, in an attempt to justify the granting of emergency relief from abuse, has set forth in detail the allegations made by Montalvo in support of her petition. The issues before us, however, simply do not concern the propriety of the Uniform Child Custody Jurisdiction and Enforcement Act or whether Montalvo properly availed herself of its provisions. We have no occasion to comment on the act's laudable goals as they relate to the protection of children from abuse or from the abuse of court process that frequently manifests itself in multijurisdictional, high conflict custody matters. Likewise, we have no occasion to reconsider whether the court properly granted emergency relief from abuse.

Likewise, unlike the dissent, we have not addressed issues relating to attorney-client privilege or to any privilege that might have attached to the communications between any of the attorneys involved in the dispute. The plaintiffs did not raise the issue of privilege during the proceedings concerning the underlying application, during the attorney misconduct proceedings, in their appellate briefs or during oral argument before this court. The issue is not before us. Nonetheless, it suffices to say that it would be peculiar for a member of the bar to assert any such privilege by misrepresenting a material fact to the court during an ex parte proceeding.

Instead, the issues before us in the present appeal concern attorney misconduct. Our inquiry focused on what Daniels stated to the court and what Driscoll failed to do in light of such statements.[8] If this opinion has a

---

[8] Accordingly, we have had no occasion to review matters outside of the record of the attorney misconduct proceedings. Information from the record of proceedings related to the court's action on the emergency application, to the extent that it was not incorporated into the record of the attorney misconduct proceedings, is not part of the record properly before us in this appeal.

"chilling effect" at all, we certainly intend that it have such effect on officers of the court who would violate their sworn obligation not to misrepresent material facts to the court.

## II

The plaintiffs next claim that the court violated their due process rights by failing to give them adequate notice of the purpose of its misconduct hearing. We disagree.

We observe that the plaintiffs failed to raise the issue of inadequate notice at any time during the proceedings before the trial court. The plaintiffs did not seek additional information about the hearing after they received a letter from Judge Alander wherein he stated that he wanted to conduct a hearing in regard to Davis' allegation of misconduct. The plaintiffs also did not raise the issue at the hearing itself, wherein they presented documentary and testimonial evidence in regard to the allegation of their misconduct. Further, they failed to raise the issue in their motion to reargue or at the hearing on the motion to reargue, wherein they were each represented by counsel. As a result, the trial court had no opportunity to address the issue and the plaintiffs did not preserve the issue for our review. See Practice Book § 60-5.

In their reply brief, the plaintiffs seek review of this unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine as set forth in Practice Book § 60-5. The plaintiffs failed to seek review of their unpreserved claim under either avenue in their principal brief.

This court will not review claims that are raised for the first time in a reply brief. That policy applies to requests for review under *Golding* as well as requests for review under the plain error doctrine. See, e.g.,

*State* v. *Barlow*, 70 Conn. App. 232, 249, 797 A.2d 605 (declining to afford plain error review), cert. denied, 261 Conn. 929, 806 A.2d 1067 (2002); *State* v. *Ancona*, 69 Conn. App. 29, 36 n.10, 797 A.2d 1138 (declining to afford review under *Golding*), cert. granted on other grounds, 260 Conn. 928, 798 A.2d 970 (2002); *State* v. *Wright*, 62 Conn. App. 743, 756, 774 A.2d 1015 (declining to afford review under *Golding*), cert. denied, 256 Conn. 919, 774 A.2d 142 (2001); *State* v. *Smith*, 57 Conn. App. 478, 483, 749 A.2d 67 (2000) (declining to afford review under *Golding*); *State* v. *Salvatore*, 57 Conn. App. 396, 401, 749 A.2d 71 (declining to afford review under either plain error doctrine or under *Golding*), cert. denied, 253 Conn. 921, 755 A.2d 216 (2000). By raising their claim for review under those doctrines in their reply brief, the plaintiffs deprived the adverse party of an opportunity to brief the merits of the claim. For those reasons, we decline to review the claim of inadequate notice.

The writ of error is dismissed.

In this opinion DRANGINIS, J., concurred.

FLYNN, J., dissenting. Although I believe that both the trial court and the majority have taken a principled approach to a difficult issue before them, I respectfully dissent. I believe the result reached not only was unfair to the two attorneys reprimanded but also has chilling effects reaching beyond them. It was unfair to them because I do not believe that there is sufficient evidence to show that it was highly probable that either plaintiff made or participated in a material misrepresentation. The chilling effect on others relates to the legal profession's duty to keep a client's confidences and to bring applications for emergency relief from child abuse in Connecticut. I would therefore reverse the trial court's decision reprimanding the plaintiffs.

The court found that both of the plaintiffs were in violation of rule 3.3 (a) (1) of the Rules of Professional Conduct, which provides that "[a] lawyer shall not knowingly: (1) Make a false statement of material fact or law to a tribunal . . . ." The court also found that the plaintiffs violated rule 3.3 (d) by failing, in the course of an ex parte proceeding, to "inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse." Rules of Professional Conduct 3.3 (d). By their very terms, both rules apply to facts only when they are material facts. A material fact is one that will affect the outcome of the case. See *Tutsky* v. *YMCA of Greenwich*, 28 Conn. App. 536, 540, 612 A.2d 1222 (1992). Furthermore, "the applicable standard of proof for determining whether an attorney has violated the Rules of Professional Conduct is clear and convincing evidence . . . ." (Citation omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 322, 796 A.2d 516 (2002). Evidence is clear and convincing if it "induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." *Lopinto* v. *Haines*, 185 Conn. 527, 534, 441 A.2d 151 (1981).

I begin by noting that serious issues of child safety were raised in the underlying application. The affidavit of the applicant mother, Inez Montalvo, supporting emergency relief against the father made disturbing allegations concerning the physical safety of her two children who were residing with their father in New Jersey. In her affidavit,[1] she described a warning from

---

[1] This affidavit is attached to the application for emergency relief in *Montalvo* v. *Nieves*, Superior Court, judicial district of New Haven, Docket No. FA01-0447041S (April 9, 2001), the same case and docket number of the memorandum of decision ordering reprimands that prompted this writ of error, which causes our review of that decision.

the respondent father's live-in girlfriend that the children were at risk residing with their father and that they should not be brought back to him from Connecticut to New Jersey after finishing weekend visitation. The girlfriend told Montalvo that the level of violence had escalated to the point where the children "were in imminent danger." This information was confirmed by the children themselves, who described being hit by their father. On one occasion, only three weeks before the affidavit, a bruise on one child's thigh, which the father inflicted, took almost ten days to clear. Both children were afraid to return to live with their father in New Jersey. He had a history of drug abuse and violence. There were ample factual grounds to initiate the emergency application in Connecticut to protect the children, who were then in this state, from abuse in New Jersey.

Second, our law clearly provides that such emergency applications for relief from abuse may be made in situations where children are abused, even though divorce proceedings affecting their custody are pending in a sister state. Section 15 of Public Acts 1999, No. 99-185, now General Statutes § 46b-115n (a), confers upon the Connecticut Superior Court "temporary emergency jurisdiction if the child is present in this state and . . . (2) it is necessary in an emergency to protect the child because the child, a sibling or a parent has been, or is under a threat of being, abused or mistreated . . . ." This is not dependent on whether another state has exercised jurisdiction or the applicant has a lawyer in another state or what that lawyer's opinion is. Under General Statutes (Rev. to 2001) § 46b-120 (3), now (4), " 'abused' means that a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means . . . ." Under § 46b-115n, the factors that are material are (1) whether the child or children are present in this state, and here they were, and (2)

whether a child, sibling or parent is under a threat of mistreatment or abuse, meaning that a child had physical injuries inflicted on him or her other than by accidental means. Those are the only material issues on which material facts need be found. Representations on other matters are collateral, because, being outside the statutory criteria, they should not have an effect on the outcome of the case.

The majority cites something that the trial court did not, namely General Statutes § 46b-115q, in that the court in any proceeding under Chapter 815p, the Uniform Child Custody Jurisdiction and Enforcement Act, "may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum . . . ." General Statutes § 46b-115q (a). The majority, however, does not set forth the statutory factors which the court would consider in determining whether a forum was inconvenient. An analysis of those factors reveals that whether a client's joint, out-of-state counsel should, could or would proceed in the sister state is not a factor.[2] The trial court did not cite forum non conveniens or § 46b-115q, because none of the eight statutory factors which a

---

[2] General Statutes § 46b-115q (b) provides: "In determining whether a court of this state is an inconvenient forum and that it is more appropriate for a court of another state to exercise jurisdiction, the court shall allow the parties to submit information and shall consider all relevant factors including: (1) Whether family violence has occurred and is likely to continue in the future and which state could best protect the parties and the child; (2) the length of time the child has resided outside this state; (3) the distance between the court in this state and the court in the state that would assume jurisdiction; (4) the relative financial circumstances of the parties; (5) any agreement of the parties as to which state should assume jurisdiction; (6) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child; (7) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and (8) the familiarity of the court of each state with the facts and issues in the pending litigation."

court is to consider can, even under a strained interpretation, be construed to include an out-of-state counsel's opinion about seeking emergency relief in any state. Furthermore, the court, pursuant to statutory authority, had its own direct conversation with the New Jersey judge who had been hearing the matter and was thereby able to satisfy any questions it had about how quickly the matter might be heard in New Jersey.

In a sworn affidavit attached to her petition, Montalvo swore that the father had hit one of their two children so hard with a belt that the resulting bruise lasted ten days. While there may be a place for corporal punishment in the discipline of children by parents, the conduct attributed to the father in the mother's affidavit goes beyond proper parental discipline and qualifies as child abuse under § 46b-120 (3), now (4). At the ex parte hearing on the application for immediate relief, Montalvo took the witness stand and testified under oath that both her daughters and the father's live-in girlfriend had told her of the threats to the safety of the two girls when she picked up the children for weekend visitation. There was both statutory jurisdiction and authority to grant emergency relief from this abuse, and a factual basis on which to exercise jurisdiction in Connecticut if the court chose to do so. Our law contemplates that even though a proceeding is pending in another state, an application for such an emergency temporary order may be made here in Connecticut because the safety and best interests of children are paramount.

I have already discussed what elements of § 46b-115n are material to the court granting relief, and the discussions between Montalvo's New Jersey and Connecticut counsel clearly do not fall within the realm of matters considered material. I now observe that the record contains no evidence of a misrepresentation of a nonmaterial fact either, unless one concluded that, confronted

with evidence of excessive beating of the children and danger to their physical welfare in New Jersey, one "should" bring a motion for emergency custodial relief in New Jersey through an attorney in New Jersey who stated to the plaintiffs and the court that she did not want it filed at all, either in New Jersey or Connecticut. Attorney Davis stated that she was not prepared to divulge her reasons for opposing any petition because she did not think they were relevant. Montalvo and attorney Driscoll, however, did testify that attorney Davis had told them that the New Jersey judge would be angered[3] if a motion of this sort were brought.[4] I see no misrepresentation, therefore, in Daniels' answer to the court's questions that it was the opinion of New Jersey counsel, Davis, "that we should not do it in New Jersey for a number of reasons, none of which" Daniels thought were "flattering to the judiciary there . . . ."

Daniels' representation was that the application for emergency relief *should* not be brought in New Jersey,

---

[3] Montalvo actually quoted attorney Davis as using a scatological term sometimes used to describe anger.

[4] In the hearing about attorney Davis' charges of unprofessional conduct against Daniels and Driscoll, Davis buttressed her claim that she was ready to bring an application for emergency relief in New Jersey by claiming to have drafted just such an application and presenting it in evidence. Whether she had really done so or instead prepared this paper much later after she knew the Connecticut application was filed only to support her complaint against Daniels and Driscoll, and to attenuate any damage to her professional reputation in New Jersey, would affect her credibility. She first attempted to hide behind attorney-client privilege when examined by Daniels about the application she claimed to have been prepared to file, despite the fact that she had publicized issues about conferences between the mother's lawyers in a letter to the judge apparently without any prior waiver from the client. After the mother was called to the witness stand and waived the privilege, and while Davis was a witness on the stand, Davis then objected that the line of questioning was irrelevant. The court sustained Davis' relevancy objection. Leaving aside whether it is appropriate for witnesses to interpose objections on the ground of relevancy to questions posed to them, the court's ruling deprived the plaintiffs of the opportunity to test her veracity.

not that the New Jersey attorney *would* not bring the case in New Jersey or that the case *could* not be brought in New Jersey. It seems to me, for example, that whether one *could* jump over a cliff, *would* jump over, or *should* jump all involve different considerations. In the hearing the court held on the complaint of the New Jersey counsel, attorney Driscoll testified that in attorney Davis' conversation with him she opined that bringing a relief from abuse petition and seeking temporary custody would alienate the New Jersey judge who might preside over the case. Davis did not dispute this testimony. Whether attorney Davis said that filing in New Jersey would alienate the New Jersey judge who had reserved decision on permanent custody was therefore not at issue.

In terms of some duty of further disclosure by attorney Daniels, he clearly did not disclose all of his associate's conversations with attorney Davis. This was clear from what Daniels did say on the record. Daniels described the conversations to the court as follows: "In an attempt to talk to counsel, we learned a couple of things. One, that there is no pushing that judge in New Jersey, and who has had the case for some time. And it's not clear even that he would be the judge to hear a restraining order issue in New Jersey. But while that was pending, the children would presumably have to be returned to the father by the mother." Daniels elaborated upon those statements when he said, "Mr. Driscoll spoke to counsel in New Jersey, and it was her opinion that we should not do it in New Jersey for a number of reasons, none of which I think are flattering to the judiciary there, but we are relying on that." These statements clearly were not an attempt to repeat verbatim the conversations between Driscoll and Davis. It was clear that Daniels paraphrased only a small portion of the conversations, and he did not imply in any way that that was all that was said.

At the hearing on Davis' complaint, there was evidence from Davis and Driscoll about their conversations, but I would not uphold Driscoll's reprimand for failure to interject something on the record in the course of his senior associate's handling of the case because, as I have already indicated, there was no proof of a misrepresentation as to anything material under § 46b-115n or § 46b-115q, which govern this case.

I now turn to the interplay between rules 1.6 and 3.3 of the Rules of Professional Conduct, which bound both Daniels and Driscoll. The court recognized in footnote 5 of its decision that "[i]t may well be that attorneys Daniels and Driscoll were not required to make any statements to me concerning the opinions of attorney Davis. . . ." Attorney Davis, herself, belatedly recognized her duty to keep client confidences and advice confidential.[5] There was no legal requirement that confidences of a client needed to be revealed to a judge or anyone else. See Rules of Professional Conduct 1.6. Communications between the petitioner's New Jersey and Connecticut counsel about her case are protected. There is a direct protection for client to attorney communications and derivative protection for attorney to client communications. 1 P. Rice, Attorney-Client Privilege in the United States (2d Ed. 1999) § 5.2, p. 35. An attorney's communication with cocounsel also is protected. See *Natta* v. *Zletz*, 418 F.2d 633, 637 n.3 (7th Cir. 1969). Despite starting the entire disciplinary process in motion before the court by sending a letter to the court disclosing confidential advice she had given to the client without any release from the client, attorney Davis refused to be examined by Daniels under

[5] "[The Court]: Now, that weekend before the Martin Luther King holiday on Monday, I take it you had some conversations with Ms. Montalvo about something that had just occurred, is that right?

"[Davis]: Judge, I don't, you know, I don't know that I'm required to answer that question because it really does have to do with my representation of Ms. Montalvo. And that's a confidential relationship."

oath at the hearing on her allegations against him and Driscoll based on her "objection" as to attorney-client privilege and only returned to the witness stand after the mother was called to the witness stand and waived her confidentiality privilege.

By reprimanding Daniels and Driscoll under rule 3.3 (d), the court implicitly held that where an attorney discloses a statement made to his office by cocounsel, Davis, there was a duty to disclose all conversations. I do not believe that such a duty existed here as to immaterial matters. Imposing such a duty seems at odds with rule 1.6 (a) of the Rules of Professional Conduct, which permits a lawyer to disclose some of a client's confidences where "impliedly authorized in order to carry out the representation" of the client. For example, a lawyer may use information gathered from confidential communications to draw an ex parte application for a prejudgment remedy. I know of no authority that in such a situation this opens the door to an obligatory exposition of *all* the client's communications or derivatively confidential communications with cocounsel unless they are material to the matter before the court.

In my opinion, a mistake has been made in the court finding that Daniels intentionally misrepresented any material fact which Driscoll had an obligation to correct. There was no clear and convincing evidence to support such a finding. Daniels' statements about what Davis thought should or should not be done were not material to any judgment to be made by the court under § 46b-115n, nor was there clear and convincing evidence that Daniels or Driscoll misrepresented the truth. I, therefore, would conclude that the Rules of Professional Conduct did not obligate either Daniels or Driscoll to say more than was said. Neither § 46b-115n nor § 46b-115q nor our Rules of Professional Conduct made Davis' opinions material. I am left with the definite and

firm conviction that a mistake has been made. For these reasons I respectfully dissent.