******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., concurring in the judgment. The victim's rights amendment to our state constitution was adopted to ensure that crime victims would no longer be relegated to the sidelines as largely silent, passive observers of a process in which their sole role was as witness and informant.[1] See Conn. Const., amend. XXIX (b). However, because the courts are barred from construing it to create a basis for any form of appellate relief and the legislature has not enacted any enforcement mechanisms in accordance with the constitutional directive, the promise of the amendment is largely illusory under the law as it currently stands. This state of affairs undermines the foundational principle, declared more than 200 years ago, that a government of laws "will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). In light of the constitutional and statutory constraints on this court, I agree with the majority that this court lacks the authority to grant the form of relief sought by the plaintiff-in-error, Tabatha Cornell.[2] Nonetheless, this court can shine a light on the circumstances that gave rise to the violation of her constitutional rights. We can also exercise our supervisory authority to adopt procedures to prevent a similar recurrence. I would do both.

I

Our state constitution conferred on the plaintiff-in-error "the right to object to . . . any plea agreement entered into by the accused and the prosecution and to make a statement to the court prior to the acceptance by the court of the plea of guilty or nolo contendere by the accused" and "the right to make a statement to the court at sentencing . . . ." Conn. Const., amend. XXIX (b) (7) and (8). In other words, the plaintiff-in-error had the right to state her opinion, orally or in writing, as to both the substance of the plea and the attendant penalty, before the court accepted the plea and sentenced the defendant, Justin Skipwith. Statutes elaborate on the obligations of both the prosecution and the court to ensure that crime victims have notice and an opportunity to take advantage of these rights. The Office of Victim Services is charged with providing a training program for judges and prosecutors, among others, to ensure that they are familiar with these obligations. See General Statutes § 54-203 (b) (16).

Central to the present case is General Statutes § 54-91c.[3] That statute prescribes the prosecutor's obligations and then requires the trial court to "inquire on the record whether any victim is present for the purpose of making an oral statement or has submitted a written statement. *If no victim is present and no such written*

*statement has been submitted, the court shall inquire on the record whether an attempt has been made to notify any such victim* [*of the date, time and place of the judicial proceeding concerning the acceptance of a plea pursuant to a plea agreement, provided the victim has informed the assistant state's attorney that the victim wishes to make or submit a statement*] . . . . After consideration of any such statements, the court may refuse to accept, where appropriate, a negotiated plea or sentence, and the court shall give the defendant an opportunity to enter a new plea and to elect trial by jury or by the court. . . ." (Emphasis added.) General Statutes § 51-91c (b). This court has recognized that "acceptance of a guilty plea must be contingent upon hearing from the victim in order to provide the victim with a meaningful right to participate in the plea bargaining process." *State* v. *Thomas*, 296 Conn. 375, 390–91, 995 A.2d 65 (2010).

The record in the present case reveals the following undisputed facts relevant to compliance with these requirements. In connection with his actions causing the death of the plaintiff-in-error's daughter, Briana Washington, the defendant was charged with manslaughter in the first degree, manslaughter in the second degree with a motor vehicle, misconduct with a motor vehicle, and operation of a motor vehicle while under the influence of liquor. In October, 2012, Attorney Jeffrey D. Brownstein notified the assistant state's attorney of record in the case, in writing, that he represented the plaintiff-in-error. Brownstein asked to be contacted prior to any offer and disposition on the case, stating that he and the plaintiff-in-error planned to be present at disposition and "want the opportunity to be a part of the plea negotiations and to address the court at sentencing." Brownstein further indicated that the plaintiff-in-error was opposed to any suspended sentence and to any plea that would permit the defendant to avoid an admission of guilt (*Alford* or nolo contendere plea).[4] Before trial commenced, the case was transferred to another assistant state's attorney, Jason Germain. Brownstein did not receive a response to his letter from anyone in the office of the defendant-in-error, the state's attorney for the judicial district of Waterbury.

Prior to the commencement of jury selection on March 4, 2013, a victim's advocate for the state, Barbara Jean Quinn, initiated several communications to Brownstein, including an acknowledgement of his letter and an offer to discuss the case, but Brownstein was unavailable to do so at that time. Quinn also provided Brownstein with information about case status and various pretrial dates, including jury selection. Neither the plaintiff-in-error nor Brownstein were available on March 4, but the plaintiff-in-error's son and a close friend of Washington, who identified herself as Washington's "sister," attended jury selection that day. Quinn

and Germain spoke with the two of them at that time. Either at that time or in a telephone call between Quinn and Brownstein that same day, Quinn or Germain explained that there may be serious problems with the charge of manslaughter in the first degree, that one of the state's witnesses may have given false information to the police, and that the defendant may not receive a lengthy sentence.

Approximately one month later, on April 2, 2013, Germain, defense counsel, and the defendant appeared before the trial court, at which time they presented the court with a proposed plea agreement. Pursuant to that agreement, the defendant would plead nolo contendere to the charge of manslaughter in the second degree with a motor vehicle, as well as to the charge of operation of a motor vehicle while under the influence of liquor. The agreed upon total effective sentence was ten years imprisonment, execution suspended after two years, and three years probation.

After the court conducted a plea canvass with the defendant and accepted the plea, but before the defendant was sentenced, the court directed the following inquiry to Germain:

"The Court: You're in contact with the family?

"[Germain]: I did contact them. I talked to them before this case started. It's the sister that's still involved. I did have [Quinn], our victim advocate from part A, contact her and advise her. We talked about the problems with the case being [the defendant] was stabbed, the situation, how it unfolded, and the problems we did have with the case. She understood it would be a tough case. I don't think there's going to be any problem. I think they'll be happy with the disposition."

The trial court then confirmed the parties' waiver of the presentence investigation report and imposed sentence on the defendant. Later that day, Brownstein received word from Quinn that the defendant had been sentenced in accordance with the plea agreement.

The foregoing facts reflect a clear abrogation of the plaintiff-in-error's constitutional and statutory rights, which she unambiguously invoked through her counsel's letter to the assistant state's attorney of record. The trial court may have intended its open-ended question to ascertain whether the members of Washington's immediate family had been notified of, and intended to exercise, their rights, but it plainly did not elicit such information. It is unclear whether Germain's oblique response was intentionally or inadvertently misleading. Germain's representation to the court that the "sister" was the only family member involved[5] was directly contradicted by Quinn's communications with Brownstein up until the final notice that the defendant had been sentenced, and Brownstein's letter, which presumably was in Germain's case file. Even assuming that Germain

misunderstood that Washington's "sister" was the only family member intending to be involved, there is no indication that the fact or substance of the proposed plea agreement had been discussed with her, that she had been informed that family members had a right to make a statement to the court before they decided whether to accept the plea, or that she had been given notice of the plea hearing date in order to avail herself of that right. The preface to Germain's final remarks— "I don't think" and "I think"—strongly suggests that no such conversation occurred, as it reflects speculation rather than an informed basis upon which he could make a representation to the court that the plea agreement would meet the expectations of Washington's family. There was, of course, reason to believe it would not. Even if Washington's family members had resigned themselves to the possibility that the defendant would not serve a lengthy sentence because of information communicated to them about the difficulties in prosecuting the case, it was a paramount concern to them that he not be offered a plea agreement under which he could avoid acknowledging responsibility for causing Washington's death. That concern, however, was never brought to the court's attention.

As the trial court later acknowledged at the hearing on the plaintiff-in-error's motion to correct an illegal sentence, the blame for this outcome did not rest solely with the state. Germain's vague reply to the court's open-ended inquiry should have prompted the court to press him further to ascertain whether he had fulfilled his statutory obligations as a prosecutor. See footnote 3 of this concurring opinion. Had the court done so, it presumably would have ascertained facts that would have caused it to withdraw and defer acceptance of the plea until such time as the plaintiff-in-error was afforded her constitutional right to review and respond to the plea agreement.

To their credit, once these defects were subsequently brought to their attention, the defendant-in-error and the trial court made commendable efforts to acknowledge the failures and to make amends. Germain and the trial court both repeatedly apologized to the plaintiff-in-error. Maureen Platt, the state's attorney for the judicial district of Waterbury, demonstrated laudable leadership by appearing at the hearing on the plaintiff-in-error's motion to personally accept responsibility for the actions of Germain, her subordinate, and to apologize for unnecessarily adding to the plaintiff-in-error's grief. In addition to these measures, the trial court gave the plaintiff-in-error every leeway to address the court and to voice her views on the record in the presence of the defendant. By providing that opportunity and then explaining why it would have accepted the plea agreement even if it had known her position in advance, the trial court arguably cured, or at least ameliorated, the constitutional violation in the present case. Cf. *State*

v. *Casey*, 44 P.3d 756, 758, 766 (Utah 2002) (concluding trial court remedied prosecutor's failure to convey victim's opposition to plea when it reopened plea at sentencing, afforded victim opportunity to state objection to reduced charge, and reaffirmed prior plea agreement). The plaintiff-in-error's writ to this court makes clear, however, that a post hoc hearing was not an adequate remedy in her view.

## II

Hopefully, the present case will prompt our legislature and the Rules Committee of the Superior Court to take steps to prevent a similar recurrence. In the meantime, because no form of appellate relief is available, it is all the more important that our trial courts be vigilant and proactive in protecting victims' rights. Several states have prescribed in greater detail the procedure whereby the trial court should elicit information from the state regarding steps undertaken to protect the victim's rights before accepting a plea or imposing sentence.[6] It has been recognized that "[c]ourt certification of compliance efforts provides a system of checks and balances that can help preserve victims' consultation rights without placing an undue burden on the criminal justice process." United States Department of Justice, Office for Victims of Crimes, Office of Justice Programs, Legal Series #7 Bulletin, "Victim Input Into Plea Agreements," (November 2002), p. 3 (available at https://www.ncjrs.gov/ovc archives/bulletins/legalseries/bulletin7/ncj189188.pdf (last visited July 28, 2017). Drawing on these sources, I would exercise our supervisory authority to prescribe such a procedure to fill the current gap in our scheme.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *Kervick* v. *Silver Hill Hospital*, 309 Conn. 688, 710, 72 A.3d 1044 (2013). We have previously exercised this authority to direct our trial court to conduct a canvass or a particular inquiry to protect important rights. See, e.g., *In re Yasiel R.*, 317 Conn. 773, 788–96, 120 A.3d 1188 (2015) (requiring canvass of parent prior to termination of parental rights); *State* v. *Gore*, 288 Conn. 770, 787, 955 A.2d 1 (2008) (requiring canvass of defendant to establish validity of jury trial waiver); *Duperry* v. *Solnit*, 261 Conn. 309, 329, 803 A.2d 287 (2002) (requiring canvass of defendant entering plea of not guilty by reason of mental disease or defect to ensure that plea is knowing and voluntary when state substantially agrees with claim of mental disease or defect); *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (requiring

preliminary inquiry, on record, when court is presented with allegation of jury misconduct in criminal case).

In accordance with this authority, I would direct our trial courts to undertake the following measures at the outset of a sentencing hearing or any judicial proceeding concerning the acceptance of a plea pursuant to a plea agreement:

(a) If the victim is not present or has not submitted a written statement, the trial court shall ascertain from the state's attorney:

(1) Whether the victim was informed of his or her right to make a statement to the court, orally or in writing, regarding the plea or sentence, and, if not, whether reasonable measures were undertaken to do so;

(2) If the victim elected to provide such a statement, whether the victim (or the victim's counsel) was notified of the date, place and time of the proceeding;

(3) If the state has proposed a plea agreement, whether the victim has been informed of his or her right to be provided with the terms of the proposed agreement in writing;

(b) If the state's attorney has not established that a reasonable attempt has been made to notify the victim of the foregoing rights, the court shall, unless doing so would violate a jurisdictional requirement or the defendant's substantive rights:

(1) reschedule the hearing; or

(2) proceed with the hearing but reserve ruling until the victim has been notified and given an opportunity to make a statement; and

(3) order the state's attorney to notify the victim of the rescheduled hearing.

(c) If the victim is present, the court shall inquire whether he or she has been informed of the foregoing rights and shall recess the hearing or undertake appropriate measures if necessary to afford the victim a reasonable opportunity to exercise those rights.

By enumerating these procedures, I do not intend to limit the trial court's authority to undertake any other measures that would advance the purposes of the victim's rights amendment.

This case provides a stark reminder that a constitutional right, unadorned by a remedy to enforce or vindicate that right, is a hollow one. Indeed, a victim of crime who is denied her constitutional rights by a prosecutor or the court is, in a very real sense, victimized all over again. Without understating the significance of the primary victimization, this second victimization may be in some ways more odious because it is inflicted upon her by the levers and gears of the judicial system itself,

the very institutional mechanism she—and all people in civilized society—relies on to have her offender held to account. We as a state must do better than this.

I respectfully concur in the judgment.

[1] See 39 H.R. Proc., Pt. 9, 1996 Sess., p. 2808, remarks of Representative Michael P. Lawlor (amendment would provide victims with "true role in the process"); 39 S. Proc., Pt. 6, 1996 Sess., p. 1982, remarks of Senator Kevin Sullivan (amendment would give victims their voice and "a part in the process"); cf. *Kenna* v. *United States District Court*, 435 F.3d 1011, 1013 (9th Cir. 2006) ("The criminal justice system has long functioned on the assumption that crime victims should behave like good Victorian children—seen but not heard. The [federal] Crime Victims' Rights Act sought to change this by making victims independent participants in the criminal justice process.").

[2] The majority's logic that the victim's rights amendment of the Connecticut constitution does not preclude the exercise of our jurisdiction over a writ of error alleging a violation thereunder, but does preclude affording relief on a legitimate claim brought by way of the writ seems counterintuitive. Indeed, the most natural construction of the language in this provision barring us from construing it to create a ground for "appellate relief" would seem to apply only to parties to the underlying criminal prosecution entitled to appeal, which does not include the crime victim. Nonetheless, I am persuaded that the majority's ultimate conclusion that we cannot vacate the sentence as requested in the present writ is correct because: (1) vacating a sentence is a form of appellate relief; (2) the amendment directs the legislature to provide for the enforcement of the victim's rights amendment and it has not authorized this court to provide any such relief; (3) the legislative debates on the proposed victim's rights amendment clearly indicate an intent simply to elevate existing statutory rights to constitutional status; and (4) the existing statutory scheme, which was not altered concurrently with this amendment, unambiguously precluded the courts from vacating a plea solely on the ground that a right conferred on victims had been violated. See General Statutes § 54-223 ("[f]ailure to afford the victim of a crime any of the rights provided pursuant to any provision of the general statutes shall not constitute grounds for vacating an *otherwise* lawful conviction or voiding an *otherwise* lawful sentence or parole determination" [emphasis added]).

I note that several other jurisdictions have provided, by way of constitutional amendment or statute, remedies for constitutional violations of victims' rights. See, e.g., 18 U.S.C. § 3771 (d) (3) and (5) (permitting victim to file writ of mandamus to remedy violation of victim's rights and authorizing court to reopen plea or sentence under certain conditions); *Kenna* v. *United Stated District Court*, 435 F.3d 1011, 1017–18 (9th Cir. 2006) (granting writ of mandamus under 18 U.S.C. § 3771 [d] [3] and ordering trial court to conduct new sentencing hearing allowing victims to speak if other statutory requirements met); Ariz. Rev. Stat. Ann. §§ 8-416 A and 13-4437 A (West Supp. 2016) ("[t]he victim has standing to seek an order, to bring a special action or to file a notice of appearance in any appellate proceeding seeking to enforce any right or to challenge an order denying any right guaranteed to victims"); *State* v. *Barrett*, 350 Or. 390, 255 P.3d 472 (2011) (construing constitutional and statutory provisions to authorize court to vacate sentence and conduct resentencing hearing to remedy violation of constitutional right to be present at sentencing after court accepted plea agreement without notice to victim); see generally D. Beloof, "The Third Wave of Crime Victims' Rights: Standing, Remedy, and Review," 2005 B.Y.U. L. Rev. 255, 300–31 (2005) (overviewing remedy and review concerns and approaches in various jurisdictions). Illinois' constitutional provision on crime victims' rights, which also barred the provision of such rights to be construed as a basis for appellate relief, was in large part the model for our state's victim's rights amendment. See 39 H.R. Proc., Pt. 9, 1996 Sess., pp. 2822, 2825, 2851, 2853; 39 S. Proc., Pt. 10, 1996 Sess., pp. 3246–47. Illinois amended its constitution in 2014, to change the appellate relief bar to provide: "Nothing in this [s]ection or any law enacted under this [s]ection shall be construed as creating (1) a basis for vacating a conviction or (2) *a ground for any relief requested by the defendant*." (Emphasis added.) Ill. Const., art. I, § 8.1 (e).

[3] General Statutes § 54-91c provides in relevant part: "(a) For the purposes of this section, 'victim' means a person who is a victim of a crime, the legal representative of such person, a member of a deceased victim's immediate family or a person designated by a deceased victim in accordance with

[General Statutes §] 1-56r.

"(b) Prior to the imposition of sentence upon any defendant who has been found guilty of any crime or has pleaded guilty or nolo contendere to any crime, and prior to the acceptance by the court of a plea of guilty or nolo contendere made pursuant to a plea agreement with the state wherein the defendant pleads to a lesser offense than the offense with which such defendant was originally charged, the court shall permit any victim of the crime to appear before the court for the purpose of making a statement for the record, which statement may include the victim's opinion of any plea agreement. In lieu of such appearance, the victim may submit a written statement or, if the victim of the crime is deceased, the legal representative or a member of the immediate family of such deceased victim may submit a statement of such deceased victim to the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case. Such state's attorney, assistant state's attorney or deputy assistant state's attorney shall file the statement with the sentencing court and the statement shall be made a part of the record at the sentencing hearing. Any such statement, whether oral or written, shall relate to the facts of the case, the appropriateness of any penalty and the extent of any injuries, financial losses and loss of earnings directly resulting from the crime for which the defendant is being sentenced. The court shall inquire on the record whether any victim is present for the purpose of making an oral statement or has submitted a written statement. If no victim is present and no such written statement has been submitted, the court shall inquire on the record whether an attempt has been made to notify any such victim as provided in subdivision (1) of subsection (c) of this section . . . . After consideration of any such statements, the court may refuse to accept, where appropriate, a negotiated plea or sentence, and the court shall give the defendant an opportunity to enter a new plea and to elect trial by jury or by the court.

"(c) (1) Except as provided in subdivision (2) of this subsection, prior to the imposition of sentence upon such defendant and prior to the acceptance of a plea pursuant to a plea agreement, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall notify the victim of such crime of the date, time and place of the original sentencing hearing or any judicial proceeding concerning the acceptance of a plea pursuant to a plea agreement, provided the victim has informed such state's attorney, assistant state's attorney or deputy assistant state's attorney that such victim wishes to make or submit a statement as provided in subsection (b) of this section and has complied with a request from such state's attorney, assistant state's attorney or deputy assistant state's attorney to submit a stamped, self-addressed postcard for the purpose of such notification. . . .

"(3) If the state's attorney, assistant state's attorney or deputy assistant state's attorney is unable to notify the victim, such state's attorney, assistant state's attorney or deputy state's attorney shall sign a statement as to such notification.

"(d) Upon the request of a victim, prior to the acceptance by the court of a plea of a defendant pursuant to a proposed plea agreement, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall provide such victim with the terms of such proposed plea agreement in writing. . . ."

[4] Under an *Alford* plea; see *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); a criminal defendant is not required to admit his guilt, but acknowledges that the state's evidence against him is sufficient to establish his guilt beyond a reasonable doubt. See *State* v. *Faraday*, 268 Conn. 174, 204–205, 842 A.2d 567 (2004). Under a nolo contendere plea, a defendant simply elects not to contest his guilt, and therefore, unlike an *Alford* plea, a plea of nolo contendere may not be used against a defendant as an admission in a subsequent criminal or civil case. See id., 205 n.17.

[5] At the hearing before the trial court, Brownstein conceded that Germain could not be faulted for assuming that Washington's friend was her sister, because she had identified herself as such.

[6] See, e.g., Ala. Code § 15-23-71 (West 2010); Ariz. Rev. Stat. Ann. § 13-4423 (West 2010); 725 Ill. Comp. Stat. Ann. 120/4.5 (West 2008); Ind. Code Ann. § 35-35-3-5 (LexisNexis 2012); Me. Rev. Stat. Ann. tit. 17-A, § 1173 (West Supp. 2016); Md. Code Ann., Crim. Proc. § 11-403 (LexisNexis Supp. 2016); N.M. Stat. Ann. § 31-26-10.1 (2010); Ariz. Rules of Crim. Proc. 39 (f); Md. Rules of Crim. Proc. 4-243; N.M. Rules of Crim. Proc. 6-113.