## STATE OF CONNECTICUT *v.* MICHAEL B. ROSS
### (SC 17335)

Sullivan, C. J., and Norcott, Vertefeuille, Zarella, Lavery, Foti and Dranginis, Js.

Argued January 5—officially released January 14, 2005*

* January 14, 2005, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*John Holdridge*, assistant public defender, with whom was *Lauren Weisfeld*, senior assistant public defender, for the plaintiff in error (office of the chief public defender).

*Harry Weller*, supervisory assistant state's attorney, with whom were *Kevin Kane*, state's attorney, *Jessica Probolus*, special deputy assistant state's attorney, and, on the brief, *Susan C. Marks*, supervisory assistant state's attorney, for the defendant in error (state).

*T. R. Paulding, Jr.*, for the defendant.

### Opinion

SULLIVAN, C. J. This writ of error is brought by the plaintiff in error, the office of the chief public defender of the state of Connecticut, to challenge the trial court's denial of its motion for permission to appear as next friend of the defendant, Michael B. Ross, and as a party in interest, an intervenor or amicus curiae in postconviction judicial proceedings in the three criminal cases against the defendant. We affirm the judgment of the trial court.

The record reveals the following procedural history. The defendant "was charged in three cases with eight counts of capital felony in violation of General Statutes § 53a-54b. The trial court dismissed two counts for lack of territorial jurisdiction and, after a jury trial, the defendant was convicted of four counts of capital felony in violation of § 53a-54b (5) and two counts of capital felony in violation of § 53a-54b (6).[1] *State* v. *Ross*, 230

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) murder committed in the course of the commission of sexual assault in the first degree . . . ."

Conn. 183, 188, 194–95, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) . . . . After a separate penalty phase hearing pursuant to General Statutes (Rev. to 1987) § 53a-46a, he was sentenced to death. The defendant appealed from the judgments to this court. We affirmed the defendant's convictions, but determined that certain evidentiary rulings by the trial court in the penalty phase had impaired the defendant's ability to establish a mitigating factor and, accordingly, we reversed the judgments imposing the death penalty. [*State* v. *Ross*], supra, 286. On remand, a second penalty phase hearing was held before a jury, which found an aggravating factor for each capital felony conviction and no mitigating factor. In accordance with the jury's findings, the court, *Miano, J.*, imposed a death sentence on each count." *State* v. *Ross*, 269 Conn. 213, 223–24, 849 A.2d 648 (2004). The defendant again appealed from the judgments to this court, and we affirmed the sentences of death. Id., 392.

Thereafter, on September 21, 2004, T. R. Paulding, Jr., an attorney, entered appearances in the three criminal cases against the defendant. His appearances were in lieu of the appearances by attorneys employed by the public defender's office. At the same time, Paulding sent a letter to the trial court, *Clifford, J.*, indicating that the defendant intended to waive any further appeals or collateral attacks on his death sentences and that he wanted the court to set an execution date.[2]

---

The criminal conduct in this case occurred in 1983 and 1984. Section 53a-54b has been amended several times since 1984 for purposes not relevant here. For convenience, we cite the current version of the statute although we take note of the fact that prior to the enactment of No. 01-151, § 3, of the 2001 Public Acts, the provision of the statute concerning murder committed in the course of the commission of sexual assault in the first degree had been designated subdivision (7) rather than subdivision (6).

[2] We emphasize that the defendant has not "waived" his right to further legal proceedings in the sense that he has forfeited the ability to exercise that right in the future. The parties are in agreement that the defendant may exercise his right to file a petition for a writ of habeas corpus at any time and that, if he does so, the execution will be stayed.

The trial court held a hearing on October 6, 2004, at which it canvassed the defendant about his decision to waive further challenges to the death sentences. The defendant indicated that he had not authorized anyone other than Paulding to file legal proceedings on his behalf, that he was not under the influence of alcohol, drugs or medication of any kind, that he had not received any threats or promises, that he had discussed his desire to waive further legal proceedings with Paulding, and that he had no questions about the purpose of the hearing. Paulding indicated that the defendant had contacted him in February, 2004, regarding his desire to waive further proceedings and that they had spoken together on numerous occasions over the course of the year. Paulding also indicated that he had seen "no evidence whatsoever" that the defendant was incompetent and that he felt "very strongly" that the defendant understood the nature of the proceedings and was able to assist in his defense. Paulding stated that the defendant had come to his decision after considering the issue for a long period of time. The trial court noted that previous competency examinations had resulted in a determination that the defendant was competent and indicated that it saw no evidence to conclude otherwise. The court then set January 26, 2005, as the defendant's execution date.

On December 1, 2004, the plaintiff in error filed a motion to proceed in forma pauperis and a petition for writ of certiorari in the United States Supreme Court. The plaintiff in error represented in the filings that the defendant had refused to sign an affidavit of indigence in support of the motion because he was incompetent. The United States Supreme Court denied the motion on January 10, 2005.

Also on December 1, 2004, the plaintiff in error filed in the Superior Court a "motion for permission to appear as (1) 'next friend' of [the defendant]; and (2)

as a party in interest or as an intervener or as amicus curiae."[3] The plaintiff in error alleged in its motion that it had standing to appear as the defendant's next friend because the defendant "was incompetent when he terminated the [plaintiff in error's] representation of him; because [the defendant] is presently incompetent; and because the [plaintiff in error] has had a significant relationship with [the defendant] for some seventeen years . . . ." In addition to the motion for permission to appear, the plaintiff in error lodged with the court clerk a motion for stay of the defendant's execution pending a judicial determination as to whether the defendant is competent and a motion for stay of execution pending resolution of the pending consolidated litigation ordered by this court to determine whether Connecticut's death penalty system is racially discriminatory and therefore violates the state constitution and statutory law (consolidated litigation).[4]

---

[3] The plaintiff in error has withdrawn its motion for permission to appear as a party in interest or as an intervenor.

[4] Several defendants who have been sentenced to death in Connecticut have filed petitions for writs of habeas corpus in which they claim that the state's capital punishment scheme is illegal, arbitrary, discriminatory, disproportionate, wanton and freakish due primarily to the influence of race and other arbitrary factors on the imposition of capital punishment throughout Connecticut. See *State* v. *Reynolds*, 264 Conn. 1, 226–34, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *State* v. *Colon*, 272 Conn. 106, 377–78, 864 A.2d 666 (2004); *State* v. *Breton*, 264 Conn. 327, 405, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Cobb*, 251 Conn. 285, 499, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 504–505 n.73, 680 A.2d 147 (1996), aff'd after remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000). In December, 2002, Chief Justice Sullivan appointed former Chief Justice Robert Callahan to serve as a special master to manage the litigation of these claims. See *State* v. *Reynolds*, supra, 233. That litigation is pending at this time.

The defendant in the present case has never filed a petition for habeas corpus raising this claim. The plaintiff in error *lodged* the motion for a stay pending resolution of the claim rather than *filing* it because the motion properly would not be before the trial court unless the motion to appear as next friend, party in interest or intervenor were granted.

Thereafter, the state filed a motion seeking a determination as to whether the defendant was competent to waive his rights to seek postconviction relief and whether his waiver was knowingly and voluntarily made. The court held a competency hearing on December 9, 2004. Because the trial court had not yet ruled on the plaintiff in error's motion to appear, the plaintiff in error attended the hearing only as an observer.

Paulding represented to the trial court at the December 9, 2004 hearing that he had first represented the defendant in 1995 or 1996 when the defendant was awaiting his second penalty phase hearing. The defendant indicated at that time that he wanted to proceed pro se and to stipulate to the existence of an aggravating factor. In May, 1995, he underwent a competency evaluation to determine whether he was capable of representing himself and was found competent. Because the state's attorney indicated that he would not engage in discussions with the defendant unless he was represented by standby counsel, Paulding agreed to take on that role. After extensive negotiations, the defendant and the state entered into a stipulation that an aggravating factor existed and no mitigating factor existed. The trial court would not allow the stipulation, however. Paulding stated at the December 9, 2004 hearing that the defendant's position had been consistent throughout the 1995 proceedings: Although he believed that a mitigating factor existed, he was willing to stipulate that one did not exist. If the trial court refused to allow the stipulation, however, then the defendant would allow the public defenders to represent him and to put on an aggressive defense at the penalty phase hearing.

Paulding stated that he next heard from the defendant in February, 2004. The defendant indicated at that time that he anticipated that this court would affirm his death sentences in the pending appeal and that he did not wish to challenge tht determination in any way. Paulding told

the defendant in July, 2004, that he would represent him. Paulding stated that he had spoken to the defendant in person and by telephone approximately twenty to thirty times between July, 2004, and the date of the December 9 hearing. Paulding stated that he and the defendant had had lengthy and detailed discussions about the case and that he had "never seen any indication of a lack of understanding or a lack of competence or cloudiness in [the defendant's] judgment." As an example, Paulding stated that the defendant was aware of the statutory time constraints on setting the date for the execution and wanted to arrange things so that he would not be executed until 2005. He agreed to allow the public defenders to file a motion for reconsideration of this court's decision affirming his death sentences in order to delay the proceedings to achieve that purpose.

Paulding also stated that the defendant had been informed in detail of all of his legal options, including participating in the consolidated litigation over the constitutionality of the state's death penalty scheme. The defendant clearly indicated that he did not want to pursue any of these options and that the petition for certiorari to the United States Supreme Court had been filed against his will.

Two days before the December 9, 2004 hearing, Paulding met with Paul Chaplin, a psychologist employed by the department of correction, who met regularly with the defendant between 1988 and 1992 and, after a gap between 1992 and 1999 when Chaplin and the defendant were assigned to different prisons, since 1999. Chaplin indicated that, since the execution date was set, either he or Thomas Latier, a psychiatric social worker, had met with the defendant every day. The defendant is taking several medications including Depo-Lupron to reduce his sex drive, and Klonopin and Wellbutrin, antianxiety medications. Chaplin did not believe that the defendant was depressed but described him as

dysphoric, or somewhat unhappy, sad or anxious, which Chaplin believed to be a natural feeling under the circumstances. Chaplin was aware of the defendant's past suicide attempts and believed that he may have been depressed at that time. He found the defendant to be rational, logical and coherent, however, and believed that the defendant had been competent since he first met him in 1988.

Paulding stated that the defendant had also met regularly with Michael Tress, a psychiatrist, in the month and a half preceding the hearing. Tress indicated to Paulding that he believed that the defendant was rational and logical, and Tress saw no evidence of suicidal ideation. Tress also believed that the defendant's depression was under control. He saw no evidence that would make him question the defendant's competence. Paulding stated that, on the basis of his discussions with the defendant and with his therapists, he believed that the defendant had arrived at his decision to waive further legal proceedings in a logical and rational manner.

The trial court also canvassed the defendant. He stated that, in addition to the medications listed by Paulding, he was taking Vistaril, an antianxiety medication, on an as needed basis. The defendant also stated that the medications did not affect his understanding of the court proceedings. He gave a detailed and substantially accurate account of the past legal proceedings in the three criminal cases over the last twenty years. The defendant also indicated that he had a complete understanding of the legal options available to him, including an appeal to the United States Supreme Court and federal and state habeas actions. He indicated that he did not want to pursue those options. The defendant denied that he was suicidal and stated that he wanted to waive further legal proceedings in order to spare his family and the families of the victims the pain of further

public proceedings. He also indicated that he was aware that he could change his mind and obtain a stay of execution up to the time of execution.

After the parties had presented their cases, the state's attorney requested a brief recess to consider a matter that had just been brought to his attention, which the court granted. When the court reconvened, the state's attorney stated that he felt that he had an obligation to advise the court that he had met Karen Goodrow, an attorney with the public defender's office, in the lobby of the courthouse before the hearing and that Goodrow had stated that she believed that the defendant was not competent. The state's attorney asked that the trial court question Goodrow about the basis for her belief. The court addressed Goodrow, who was in the audience, and asked her whether she would be willing to answer questions. Goodrow asked for a recess until after lunch in order to "compose [herself]" and to reschedule other matters. The court granted a five minute recess. After the recess, Deborah Del Prete Sullivan, another attorney with the public defender's office, addressed the court and stated that the public defenders were at the hearing as observers only and were not prepared to present evidence. She further stated that Goodrow was "very emotional" and did not want to testify. Del Prete Sullivan stated that the public defenders would be willing to present evidence of the defendant's incompetence at a hearing on the plaintiff in error's motion for permission to appear. The court stated that it did not know if it would allow such evidence to be presented at the hearing on the motion for permission to appear, but that it would not require Goodrow to address the court at the present hearing.

At the conclusion of the hearing, the trial court stated that the defendant "clearly was lucid [and] understood the court's questions, the attorney's questions. He is educated, intelligent, articulate, insightful, clearly

understands, in my opinion, the lines he is forgoing, and he certainly is firm in his decision." The court further stated that, although it would appear to a layperson that the defendant "was competent under any standard that would apply," the court required additional information as to whether the defendant had any mental disorder, disease or defect that might affect his decision. Accordingly, the court ordered that the defendant undergo a competency examination by Michael Norko, a psychiatrist, and scheduled a competency hearing for December 28, 2004. The court also scheduled a hearing on the plaintiff in error's motion to appear on behalf of the defendant for December 15, 2004.

At the hearing on the plaintiff in error's motion to appear, the trial court heard arguments from the plaintiff in error, Paulding and the state's attorney. The plaintiff in error made an offer of some of the evidence that it would present at the competency hearing if the court allowed it to participate,[5] but indicated that it had "a great deal of relevant information to the question that [was] not available" at that time. The court concluded that the plaintiff in error did not have standing as a party of interest or as an intervenor to appear in the postconviction proceedings. The court also denied the plaintiff in error's request to participate in the proceed-

[5] Specifically, the plaintiff in error represented that the defendant was upset when the trial court ordered a competency evaluation and that it was clear that he was not upset for the families of the victims, but for himself; he has attempted to commit suicide three times; Paulding's discussion of the defendant's dysphoria was misleading because that condition is defined as an emotional state characterized by anxiety, depression and restlessness; the defendant never responded to the court's question as to whether he accepted the justice of his execution; the court never asked the defendant whether he wanted to waive clemency; the standard for determining competency under *Rees* v. *Peyton*, 384 U.S. 312, 314, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966), is not whether the defendant is prevented from making a rational choice, but whether his ability to do so is substantially affected; and the defendant lied about the lack of mitigating factors when he attempted to stipulate to the death sentence.

ings as an amicus curiae. With respect to the motion to appear as the defendant's next friend, the court concluded that it had no reason to believe that the defendant was not competent. Accordingly, it concluded that the plaintiff in error had no standing to appear as a next friend at that time. The court stated, however, that if the defendant were shown to be incompetent at a later date, the court would reconsider its decision. The court stated that it would not allow the plaintiff in error to participate in the December 28, 2004 competency hearing, but that if the plaintiff in error had information relevant to that issue, it should give the information to Paulding.

Thereafter, on December 23, 2004, the plaintiff in error filed one motion in this court for review of the trial court's denial of its motion for a stay of the competency hearing and for stay of execution, and a second motion for emergency stay of the competency hearing and of execution. The plaintiff in error indicated in the motions that it intended to file a writ of error challenging the trial court's rulings on the plaintiff in error's standing on December 27, 2004. This court dismissed both motions. On December 28, 2004, the plaintiff in error brought this writ of error claiming that the trial court improperly had (1) refused to allow the plaintiff in error to present evidence and to cross-examine witnesses at the December 28, 2004 hearing and (2) denied the plaintiff in error's request to appear as an amicus curiae.

The competency hearing was held as scheduled on December 28, 2004. Norko testified at the hearing that he had first evaluated the defendant's competency in 1995 and that he had had no contact with him between that time and his meeting with the defendant on December 15, 2004, in response to the court's request for

another evaluation.[6] Norko met with the defendant for approximately three hours. He also spoke with two psychologists, a psychiatric social worker and a psychiatrist, all of whom had known the defendant for many years, and with Paulding and Goodrow. On the basis of his interview with the defendant, Norko found that he had an excellent understanding of his legal position and the ramifications of his decision to forgo any further legal proceedings. Although the defendant was occasionally emotional, he was appropriately so. His decision to forgo further appeals and collateral challenges to his convictions was based on his belief that it would be morally wrong to subject the families of his victims to the pain that would be caused by proceedings that could go on for years.

Norko did not believe that the defendant suffered from clinical depression. He was sleeping well, had a normal appetite and a good energy level, and he was able to concentrate and to process thought, had no memory disturbances and expressed no suicidal thoughts. Norko did believe that the defendant suffered from a number of mental diseases, disorders or defects, namely, a "depressive disorder not otherwise specified," sexual sadism, possibly an "anxiety disorder not otherwise specified," and a personality disorder with narcissistic, borderline and antisocial traits. A "depressive disorder not otherwise specified" is a disorder with depressive characteristics, but which does not meet the criteria for major depression. Norko did not believe that the defendant's depressive disorder interfered with his ability to think about his situation and options. Norko's diagnosis of sexual sadism was based on the reports of other psychiatrists. Norko did not believe that the disorder affected the defendant's ability

---

[6] Norko also submitted to the trial court a written report describing his investigation of the defendant's competency and setting forth his conclusions.

to reason. Finally, Norko did not believe that the defendant's personality disorder affected his ability to understand the legal proceedings and to make decisions about them.

Norko testified that he had called Goodrow after reading in the newspaper that she had evidence about the defendant's competence. Goodrow told Norko that she had met with the defendant for three hours shortly after Thanksgiving and that she had found him to be quite emotional, crying several times during the meeting. She thought that he was unable to continue his fight against the death penalty because he was emotionally exhausted. He also expressed concern that his actions would not bring any comfort to the victims' families. Norko testified that it is not unusual for a person who has made an important decision that will affect his family members to recognize that the decision may not be the right one and that such ambivalence does not mean that the person is incapable of making a rational choice.

Norko testified that the medications that the defendant is receiving probably improve his ability to make decisions rather than interfere with it. Norko saw no evidence of a thought disorder, delusional beliefs or psychosis. He also saw no evidence of suicidal ideation.

On the basis of his investigation, Norko testified that he had no reason to believe that the defendant is not competent. The defendant did have occasional brief episodes of intense anxiety for which he takes Vistaril. Although the defendant has stated that he did not believe that he should make important decisions during these moments of heightened anxiety, he also stated that the episodes are brief. Norko did not believe that any of the mental disorders, diseases or defects from which the defendant suffered substantially affect his ability to make a rational choice.

The defendant also testified at the hearing. He stated that he had occasional episodes of intense anxiety and that the episodes were relieved by taking medication. Although he had occasional doubts about whether his execution would end the pain of the victims' families, he believed that it would, and that belief was the reason for his decision. The defendant also indicated that he would accept a sentence of life imprisonment immediately if it were offered and that he believed that he could accomplish good works if that happened. He did not believe, however, that that would ever happen and did not think that the possibility of overturning the death sentences justified the cost to himself and to the families of the victims.

At the conclusion of the hearing, the trial court stated that Paulding is a competent and effective attorney who is representing his client to the best of his ability. The court found that the defendant was not making his decision on the basis of any threats, promises or coercion; he was lucid, educated, intelligent, insightful, knowledgeable, firm in his decision and understanding of the questions posed to him; he had a grasp of the legal issues involved and was aware of his legal options; none of the medications taken by the defendant have affected his ability to understand the proceedings or to make rational decisions; the defendant is not motivated by a desire to commit suicide, but by concern for the victims' families; and the defendant is aware that he can change his mind up to the date of the execution. The court concluded that the defendant has the capacity to understand his choices and, therefore, was competent under the standard set forth in *Rees* v. *Peyton*, 384 U.S. 312, 314, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966) (defendant is competent to waive further challenges to death sentence when "he has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation"). The

court further found that the defendant knowingly, voluntarily and intelligently waived his right to further challenges to his death sentences.

Thereafter, at oral argument before this court on this writ of error, the plaintiff in error represented that it had evidence of the defendant's incompetence that had never been presented to any court. In light of this representation, and despite the plaintiff in error's failure to make an offer of proof to the trial court, this court issued an order authorizing the plaintiff in error to file with this court a written offer of proof detailing the evidence that it would present at a competency hearing. The plaintiff in error filed an offer of proof, attaching summaries of the proposed testimony of Stuart Grassian, a psychiatrist; Eric Goldsmith, a psychiatrist; five attorneys with the public defender's office, namely, Barry Butler, Goodrow, Paula Montonye, Lauren Weisfeld and John Holdridge; Robert Nave, the state death penalty abolition coordinator for the Connecticut branch of Amnesty International and executive director of the Connecticut Network to Abolish the Death Penalty; and Dan Ross, the defendant's father.[7] The offer of proof also attached several documents that the plaintiff in error proposed to introduce as exhibits.

The summary of Grassian's proposed testimony stated: prisoners who are held in segregated confinement[8] frequently develop severe mental disturbances

[7] After the plaintiff in error filed its offer of proof, the defendant filed a motion to seal the offer of proof from public viewing on the ground that the offer of proof contained information protected by the attorney-client privilege. Thereafter, this court conducted an in camera review of the offer of proof to identify the privileged portions and granted the defendant's motion as to those portions.

[8] The summary defined "segregated confinement" as confinement alone in a cell of from fifty-six to ninety square feet, with minimal opportunities for social interaction, conjoint recreation or religious services, minimal educational or occupational programming and very limited environmental stimulation.

including impaired alertness, attention and concentration, hyperresponsiveness to stimuli, withdrawal, obsessive preoccupation with trivial matters, sleep disturbances and, in those most severely affected, psychotic delirium; these disturbances can affect the prisoners' ability to assist in their own defense; living under sentence of death can cause an overwhelming sense of helplessness and fear resulting in a desperate need to regain control by waiving further challenges to the death sentence; Grassian has not examined the defendant; many of Norko's conclusions were not supported by the evidence and lacked "professional skepticism"; for example, Grassian believed that Norko had failed to recognize that the defendant's intelligence would make it possible for him to conceal his "hidden agenda"; the defendant wrote a letter to Martha Elliott, a journalist, indicating that his decision was driven more by a desire to end his own pain than by concern for the families of his victims, but he knew that he could not say that publicly;[9] although the defendant expressed concerns about the families of his victims, he dismissed the arguments of his attorneys that he could help the other prisoners on death row by continuing his appeals as an attempt to impose a "guilt trip" on him; Norko's statement that the defendant consistently had desired to waive further proceedings for the last ten years is not supported by the record; Norko stated that the defendant's suicide attempts did not indicate ongoing severe depression but failed to explain them adequately; the record showed that the defendant felt helpless and out of control and had a tendency toward obsessional thinking, which could be exacerbated by his conditions of confinement and result in suicidal tendencies; the defendant has indicated that he is isolated for twenty-two or twenty-three hours each day and finds the conditions of his confinement intolerable;

---

[9] This letter was attached to the plaintiff in error's offer of proof.

and the record suggests that the defendant has become incapable of bearing his distress and despair and, therefore, his decision to waive further challenges to his death sentences is not the product of a free, voluntary and rational decision-making process.

The summary of Goldsmith's proposed testimony stated: he had not had the opportunity to examine the defendant and was unable to give a conclusive opinion as to his competency; nevertheless, he had serious questions about his competency that Norko had not adequately addressed; he believed that several factors may have negatively affected the voluntariness of the defendant's decision to forgo further challenges to his death sentences; the defendant has been diagnosed with mood disorder with emotional lability, impulsivity and depressed affect that would be exacerbated by stress and reduce the voluntariness of his waiver; the effect of the defendant's loss of his girlfriend and abandonment of his writing and other activities on the voluntariness of his waiver have not been fully explored; the effect of the conditions of the defendant's confinement on the voluntariness of his waiver should be assessed; and the effect of the defendant's suicidal tendencies on the voluntariness of his waiver should be explored.

The summaries of the proposed testimony of the defendant's former attorneys stated: the conditions of the defendant's confinement have deteriorated and have caused the defendant to desire death; the defendant has been inconsistent about his desire to forgo further challenges to his death sentences; the defendant has expressed a desire to be sentenced to life imprisonment; his reasons for wanting to forgo further proceedings have not been consistent; he has stated that he decided to waive further proceedings long ago when his thinking was clearer and that he has to trust that decision because he is too emotional to make a decision at this time; he invited his former attorneys to visit

him even though he was aware that they would try to persuade him to pursue further proceedings; he appeared at times to be attempting to fake a normal demeanor and behavior; he was no longer able to communicate freely with the other prisoners on death row; he was angry that the prison guards had expressed their beliefs that there is no death penalty in Connecticut and appeared to want to prove them wrong; he did not appear to understand that certain challenges to his death sentences could not result in a third penalty phase hearing; and he demonstrated ignorance of other aspects of the law and procedures.

The summary of Nave's proposed testimony stated: Nave has visited the defendant fifteen times in the last year; the defendant appeared to be very depressed during those visits; Nave believes very strongly that the defendant will attempt to commit suicide if his execution is stayed; the defendant believes that he will never get a fair trial; he believes that the victims' families and the public hate him; he is frustrated with the conditions of his confinement; he is saddened and frustrated by his loss of celebrity; he has stated that the other prisoners on death row were brutal murderers who took no responsibility for their crimes and engaged in bravado and grandstanding, while he had "the real guts" to go forward with his execution; he has delusional beliefs about his exalted role in the public debate on the death penalty; and he believes that he can change the public belief that he is a "monster" if he waives further proceedings.

The summary of the proposed testimony of the defendant's father stated: the defendant is extremely narcissistic; he is "not unlike a child before the age of reason," apparently unaware of the finality of death; he does not want to die but "revels in the attention being a martyr brings"; and his narcissism renders him incapable of

making a rational choice and "leaves him out of touch with reality."

The documents attached to the offer of proof[10] contain much of the same information presented in the proposed testimony of the witnesses.

The plaintiff in error claims in this writ of error that the trial court improperly: (1) denied its motion to appear as the defendant's next friend without providing it with an opportunity to present evidence of the defendant's incompetence and to cross-examine witnesses; and (2) abused its discretion in denying the plaintiff in error's request to appear as an amicus curiae. The state counters that: (1) the plaintiff in error has no federal common-law or constitutional right to participate in a full evidentiary hearing to determine whether the defendant is competent when it has made no threshold showing of incompetence and the defendant is represented by counsel; and (2) the court did not abuse its discretion by denying the plaintiff in error's request to appear as an amicus curiae when it was clear that it intended to participate in the proceedings as an adversarial party. We agree with the state.

I

Before addressing the substance of the plaintiff in error's claims, we must address the defendant's claim that this court lacks jurisdiction over the writ of error because the plaintiff in error is not aggrieved. Practice Book § 72-1 (a) provides in relevant part: "Writs of error for errors in matters of law only may be brought from a final judgment of the superior court to the supreme

---

[10] These include numerous letters and other writings authored by the defendant, newspaper articles about the defendant and the death penalty, letters from the defendant's former attorneys and others to the defendant, notes taken by the defendant's former attorneys and a statement by the Reverend Monsignor John Gilmartin about the defendant's attempt to stipulate to the death penalty.

court in the following cases: (1) a decision binding on an aggrieved nonparty . . . and (4) as otherwise necessary or appropriate in aid of its jurisdiction and agreeable to the usages and principles of law." We have held that "[t]he fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) *Bongiorno Supermarket, Inc.* v. *Zoning Board of Appeals*, 266 Conn. 531, 539, 833 A.2d 883 (2003). The defendant argues that the plaintiff in error is not aggrieved because it has no specific personal and legal interest that has been specially and injuriously affected by the trial court's decision, but has only a general interest in opposing the death penalty.

It is clear, however, that a person who seeks next friend status by the very nature of the proceeding will have no specific personal and legal interest in the matter. Rather, a next friend must show only that he is "truly dedicated to the best interests of . . . and . . . that [he has] some significant relationship with" a party who has such an interest and that there is some reason that the party in interest cannot appear for himself. (Citation omitted; internal quotation marks omitted.) *Whitmore* v. *Arkansas*, 495 U.S. 149, 163–64, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990). The plaintiff in error was entitled to make this claim to the trial court and, accordingly, was aggrieved by the trial court's determination that it had no such standing. A contrary conclusion would render unreviewable rulings by the trial

court denying next friend status. Accordingly, we conclude that we have jurisdiction to hear the writ of error.

## II

We next address the substance of the plaintiff in error's claim that the trial court improperly denied its motion to appear as the defendant's next friend without providing it with the opportunity to present evidence and to cross-examine witnesses at the defendant's competency hearing. It argues that, in the death penalty context, the mere allegation by a person with colorable standing to appear as a next friend that a defendant is incompetent requires the court to hold an evidentiary hearing at which the person seeking next friend status must be allowed to present evidence and to cross-examine witnesses. In support of this claim, the plaintiff in error argues that numerous courts have determined that the sixth, eighth and fourteenth amendments to the United States constitution require that the court hold an adversarial proceeding to determine the competency of a defendant to waive further legal challenges to a sentence of death. We disagree.

As a preliminary matter, we set forth the standard of review. Whether a person who has alleged that a defendant is incompetent to waive further challenges to his death sentence is entitled to present evidence at a competency hearing is a question of law over which our review is plenary.

In *Whitmore* v. *Arkansas*, supra, 495 U.S. 151, the United States Supreme Court considered the question of whether a third party has standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal. Ronald Gene Simmons had been sentenced to death by an Arkansas state court. Id., 153. Thereafter, Simmons notified the court of his intent to waive his right to direct appeal and, after a competency hearing, the court found

him competent to do so. Id. Jonas Whitmore, another death row inmate, then sought permission to intervene in Simmons' proceeding both individually and as Simmons' next friend. Id. The Supreme Court of Arkansas concluded that Whitmore did not have standing and the United States Supreme Court granted his petition for certiorari. Id., 153–54.

The United States Supreme Court noted that, historically, there were two prerequisites to establishing next friend standing in the habeas corpus context. "First, a 'next friend' must provide an adequate explanation— such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action. . . . Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate . . . and it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest."[11] (Citations omitted.) Id., 163–64. The court concluded that it found no reason to disturb the finding of the Arkansas Supreme Court that Simmons' competency had been established at the competency hearing, at which he was questioned by

[11] The United States Supreme Court recognized that intervention by a next friend in a federal habeas corpus proceeding was authorized by statute and that these limitations applied to that statutory proceeding. *Whitmore* v. *Arkansas*, supra, 495 U.S. 164–65. The Arkansas Supreme Court had apparently recognized as a matter of common law the availability of next friend status in state courts. Id., 165. The United States Supreme Court stated that "[w]ithout deciding whether a 'next friend' may ever invoke the jurisdiction of a federal court absent congressional authorization, we think the scope of any federal doctrine of 'next friend' standing is no broader than what is permitted by the habeas corpus statute, which codified the historical practice. And in keeping with the ancient tradition of the doctrine, we conclude that one necessary condition for 'next friend' standing in federal court is a showing by the proposed 'next friend' that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability." Id., 164–65. This court has adopted that standard as a matter of state common law. See *Phoebe G.* v. *Solnit*, 252 Conn. 68, 77, 743 A.2d 606 (1999).

counsel and by the court. Id., 165. The record of a psychiatric interview that had been admitted into evidence revealed no "evidence that he was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision." Id., 165–66. Accordingly, the court concluded that Whitmore lacked standing to proceed as Simmons' next friend. Id., 166.

The standard for mental incompetence in this context was set forth in *Rees* v. *Peyton*, supra, 384 U.S. 314. In *Rees*, the defendant, who had been sentenced to death by a state court in Virginia, filed a petition for habeas corpus in the United States District Court alleging that the conviction was unconstitutional. Id., 312–13. The District Court denied the petition, and the defendant appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed the judgment of the District Court. Id., 313. The defendant then filed a petition for certiorari in the United States Supreme Court. Id. Thereafter, the defendant directed his counsel to withdraw the petition and to forgo any further legal proceedings. Id. The defendant's counsel advised the court that he could not accede to the defendant's request because he had doubts about the defendant's mental competency. Id. The Supreme Court determined that the matter should be remanded to the District Court to make a determination as to whether the defendant "has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises. To that end, it will be appropriate for the District Court to subject [the defendant] to psychiatric and other appropriate medical examinations and, so far as necessary, to temporary federal hospitalization for this purpose." Id., 314.

The United States Supreme Court subsequently made it clear that the constitution does not require the trial court to grant a request for a *Rees* hearing by a person seeking next friend status if that person has not presented "meaningful evidence" that the defendant is incompetent. In *Demosthenes* v. *Baal*, 495 U.S. 731, 732, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990), the defendant was sentenced to death in Nevada state court. The defendant filed a petition for state postconviction relief but then withdrew the petition. Id. The court held an evidentiary hearing to determine the defendant's competency and determined that he was competent and had made an intelligent waiver of his rights. Id., 732–33. Shortly thereafter, the defendant's parents filed a petition for federal habeas corpus relief as the defendant's next friends. Id., 733. In the petition, they alleged that the defendant was not competent. In support of this claim, they relied on an affidavit of a psychiatrist who had not examined the defendant and an affidavit by the defendant's mother. Id. The United States District Court concluded that the record established that the defendant was competent and that the psychiatrist's affidavit was conclusory and insufficient to warrant an additional competency examination. Id., 733–34. Accordingly, that court denied the petition. Id., 734. On appeal to the United States Court of Appeals for the Ninth Circuit, a majority of the court held that the petitioners had established a minimum showing of the defendant's incompetence and stayed the defendant's execution. Id.

On appeal to the United States Supreme Court, the court held that the state court's determination that the defendant was competent was supported by the record and that the psychiatrist's affidavit was conclusory and lacking foundation or substance. Id., 735–36. The Supreme Court concluded that, "in the absence of any 'meaningful evidence' of incompetency . . . the District Court correctly denied [the] petitioners' motion

for a further evidentiary hearing on the question of [the defendant's] competence to waive his right to proceed." (Citation omitted.) Id., 736. Accordingly, the Supreme Court vacated the stay of execution entered by the Court of Appeals. Id., 737.

In the present case, the plaintiff in error did not mention *Demosthenes* in its brief, but argued that due process requires a *Rees* competency determination to be made in an adversarial setting and, therefore, requires the participation of a next friend to present the case for incompetence in cases where the defendant claims that he is competent without any threshold showing of incompetence.[12] In support of this argument, it cites *Ford* v. *Wainwright,* 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) (plurality opinion), and *O'Rourke* v. *Endell,* 153 F.3d 560 (8th Cir. 1998). We are not persuaded.

In *Ford* v. *Wainwright,* supra, 477 U.S. 409–10 (majority opinion), the court concluded that the eighth amendment barred the execution of insane prisoners and considered whether the District Court was required to hold an evidentiary hearing to determine the defendant's insanity before ruling on the defendant's petition for habeas corpus on the ground that he was insane. Id., 410. Under Florida law, the governor, when informed that a defendant under sentence of death

---

[12] Although the plaintiff in error did not mention *Demosthenes* in its brief, it pointed out at oral argument before this court that not all courts have required a showing of meaningful evidence of incompetence before a competency hearing is provided. See, e.g., *Franz* v. *Lockhart,* 700 F. Sup. 1005, 1025 (E.D. Ark. 1988) (ordering competency hearing even though persons seeking next friend status had not presented evidence that "can reasonably be said to cast doubt" on state court's determination that defendant was competent). It has not, however, attempted to reconcile *Demosthenes* with its claim that due process requires a case for incompetence to be presented at all *Rees* competency hearings and has not provided any reasons why this court should adopt a standard that goes beyond the requirements of due process.

might be insane, was required to stay the execution and to appoint a commission of three psychiatrists to examine the defendant. Id., 412. After receiving the report of the commission, the governor was required to determine whether the defendant had the mental capacity to understand the nature of the death penalty and the reasons why it was imposed on him. If the governor determined that the defendant had that capacity, then a death warrant issued. If not, then the defendant was committed to a mental health facility. Id. A plurality of the Supreme Court determined that this procedure was constitutionally inadequate because, first, it failed to include the defendant in the truth-seeking process. Id., 413 (plurality opinion). The plurality stated that "without any adversarial assistance from the prisoner's representative—especially when the psychiatric opinion he proffers is based on much more extensive evaluation than that of the state-appointed commission—the factfinder loses the substantial benefit of potentially probative information." Id., 414. The Florida procedure was also inadequate because it failed "to afford the prisoner's representative any opportunity to clarify or challenge the state experts' opinions or methods . . . ." Id., 415. Finally, the plurality concluded that the procedure was flawed because it took place entirely within the executive branch, which did not have "the neutrality that is necessary for reliability in the factfinding proceeding." Id., 416. Accordingly, the plurality concluded that the defendant was entitled to a competency hearing in the District Court. Id., 418.

We conclude that *Ford* does not support the plaintiff in error's claim that a person who seeks next friend status on the ground that a defendant who has been sentenced to death is incompetent to waive further legal proceedings must be permitted to present the case for competency at an evidentiary hearing. The plurality in *Ford* merely held that a competency hearing held *after*

a showing has been made that the defendant is insane must comport with certain procedural requirements. It did not address the question of what constitutes a sufficient showing to require an adversarial hearing in the first instance.[13]

We also believe that the plaintiff in error's reliance on *O'Rourke* v. *Endell,* supra, 153 F.3d 560, is misplaced. In that case, the criminal defendant, Michael O'Rourke (defendant), who had been sentenced to death in an Arkansas state court, filed a petition with the Arkansas Supreme Court seeking permission to proceed in state court with his motion for postconviction relief. Id., 565. The Supreme Court granted the petition in part, but the trial court denied relief. Id. The defendant then filed an appeal. Id. Thereafter, the defendant sent a letter to the Arkansas Supreme Court seeking to withdraw his appeal. Id. The court stayed the appeal and remanded the matter to the trial court for a competency hearing. Id. It also ordered the trial court to appoint new counsel

---

[13] We also note that the plurality opinion in *Ford* v. *Wainwright,* supra, 477 U.S. 399, does not necessarily represent the governing law on this issue. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." (Internal quotation marks omitted.) *Marks* v. *United States,* 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977). In *Ford,* Justice Powell concurred on the ground that the federal habeas statute required federal courts to apply the presumption of correctness to the factual findings of *state courts,* not the governor. *Ford* v. *Wainwright,* supra, 423 (*Powell, J.,* concurring). Powell also concluded that a constitutionally acceptable procedure for determining the sanity of a defendant who has been sentenced to death "may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake." Id., 427 (Powell, J., concurring). Nothing in this language suggests a competency hearing must be provided in the absence of any meaningful evidence that the defendant is incompetent.

for the defendant for the hearing. The Supreme Court noted that the defendant's prior counsel, Jeff Rosenzweig, contended that the defendant was insane, but that Rosenzweig "was not entitled to make the decision on whether his client is competent." (Internal quotation marks omitted.) Id. Rosenzweig then filed a motion with the Supreme Court asking to be appointed to advocate the position that the defendant was incompetent. The motion was denied. Id.

The trial court appointed Robert E. "Doc" Irwin to represent the defendant at the competency hearing and ordered Irwin to take the position that the defendant was competent. Id. Thus, Irwin was not permitted to present evidence of incompetence or to cross-examine the state's witnesses. Id., 566. The trial court determined that the defendant was competent to waive his right to appeal and, accordingly, the Supreme Court dismissed his appeal. Id. Rosenzweig, acting as the defendant's next friend and as counsel, then filed a petition for a writ of habeas corpus in the United States District Court. That court held a competency hearing and found that the defendant was incompetent. Id. Rosenzweig then asked the Arkansas Supreme Court to reconsider its dismissal of the defendant's appeal. The Supreme Court refused to do so, and the defendant reinstituted his petition for habeas corpus in the federal court. Id. The District Court granted the writ and the state appealed. Id. On appeal to the United States Circuit Court of Appeals for the Eighth Circuit, the state argued that the defendant's claims were procedurally defaulted because they had been considered and rejected by the state court and the defendant had withdrawn his appeal from that ruling. Id. The defendant argued that the state court's finding that he was competent to waive his appeal was not entitled to a presumption of correctness because the competency hearing was flawed.[14] Id., 567.

[14] In *O'Rourke*, the court stated stated: "[T]he District Court permitted [the defendant] to reopen his petition in federal court." *O'Rourke* v. *Endell*,

The Court of Appeals recognized that the United States Supreme Court "has yet to hold that a competency hearing must be adversarial in nature in order to be full and fair and to afford a prisoner the process he is due." Id. Nevertheless, it concluded that "without the appointment of a 'next friend' to advocate the position that the prisoner is incompetent, a competency hearing such as the one at issue here is not full and fair, nor does it comport with due process." Id. We note, however, that the court's decision ultimately did not rest on the absence of a fair hearing. Instead, the court concluded that the defendant had not met the second prong of the test for overcoming a procedural default, namely, that he was prejudiced by the ineffectiveness of his counsel. Id., 570. We further note that, as in *Wainwright*, the court in *O'Rourke* was addressing the question of what procedures were required at a competency hearing *after* the trial court had concluded that a sufficient showing of incompetence has been made to require an adversarial hearing in the first instance. The court did not address the question of what threshold showing is required. It is possible that, in the absence of any claim to the contrary, the Court of Appeals simply assumed that the requisite showing had been made before the first competency hearing. To the extent that *O'Rourke* may be read as suggesting that the trial court must order a competency hearing and appoint a next friend to argue the position that the defendant is incompetent when no threshold showing has been made, we dis-

supra, 153 F.3d 566. The opinion also states: "[The defendant] argues that the competency hearing was flawed and therefore the finding that he had the capacity to waive his postconviction appeal is not entitled to a presumption of correctness." Id., 567. The *O'Rourke* opinion carefully distinguishes between actions taken by the defendant personally and those taken by Rosenzweig without the defendant's consent. It appears, therefore, that the defendant consented to the reinstitution of the federal habeas proceedings and the arguments made by Rosenzweig in support thereof.

agree.[15] Although the trial court in its discretion may hold a competency hearing when a mere allegation of incompetence has been made,[16] under *Demosthenes* v. *Baal*, supra, 495 U.S. 737, participation in such a hearing by the person seeking next friend status is not constitutionally required if that person has not presented meaningful evidence of incompetence. The logical extension of the plaintiff in error's argument to the contrary is that the court must require the case for incompetence to be made even in cases where there is *no* evidence of incompetence; in other words, it must require a fraud

---

[15] We also note that, unlike in the present case, the trial court in *O'Rourke* ordered the defendant's counsel to take the position that the defendant was not competent at the competency hearing. The plaintiff in error argued vigorously at oral argument before this court that the fact that a defendant who has waived further challenges to his death sentence is represented by qualified counsel who, in the exercise of his independent judgment, believes that the defendant is competent should not affect the trial court's decision on whether to allow another person to appear as the defendant's next friend. We are not persuaded. If there is reason to doubt the competency of a defendant, then, in cases where the defendant is not represented by counsel, the validity of the defendant's claim that he is competent is, itself, under a cloud of doubt, and the appearance of a competent third person, who has made a showing that the defendant is incompetent, to act as a next friend is therefore justified. When the defendant is represented by qualified counsel who has ethical obligations to act in his client's best interests, there is far less justification for the appearance of a next friend. Indeed, to allow such an appearance would raise troubling questions about the defendant's constitutional rights to counsel of his choice and to control his own fate. Accordingly, we are not entirely convinced that the constitution ever *requires* the appointment of a next friend to argue incompetence when the defendant is represented by independent, qualified counsel. Because we conclude in the present case, however, that the plaintiff in error has not met the burden of producing meaningful evidence of the defendant's incompetence, we need not consider whether a person seeking next friend status has a higher burden when the defendant is represented by counsel. We reject, however, the plaintiff in error's argument that it should have a *lower* burden.

[16] Although some states require a competency hearing whenever a defendant wants to forgo further proceedings; see *Whitmore* v. *Arkansas*, supra, 495 U.S. 165; the United States Supreme Court has never held that such a hearing is constitutionally required. See id. Because the trial court in the present case granted the state's request for a competency hearing, we need not consider whether the hearing was constitutionally required.

on the court. The constitution cannot require such a bizarre result.[17]

In support of its claim that it was entitled to participate in the competency hearing, the plaintiff in error also relies on a number of Connecticut cases holding that, when issues of fact are necessary to the determination of standing, due process requires that a trial-like hearing be held, at which an opportunity must be provided to present evidence and to cross-examine witnesses. See, e.g., *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 695–96, 600 A.2d 1019 (1991). We are not persuaded. In cases where a person claims standing as a *party*, a determination that the party has no standing means that the entire matter is thrown out of court. It is clear that denying access to the courts without the benefit of an evidentiary hearing to determine whether access should be provided is a denial of due process. In the present case, however, the plaintiff in error is asking the court to take the extraordinary step of allowing it to appear in a matter that is already before the court as the next friend of a party who is represented by qualified counsel. We believe that, under these circumstances, the due process rights of both the plaintiff in error and the defendant are adequately protected by allowing the participation of the plaintiff in error in an

[17] We also are not persuaded by the other cases cited by the plaintiff in error for the proposition that someone must take the position of incompetence at a *Rees* hearing. See *Miller* v. *Stewart*, 231 F.3d 1248, 1250–52 (9th Cir. 2000) (granting next friend's request for evidentiary *Rees* hearing when no such hearing had been held previously and next friend presented evidence of incompetence); *Hays* v. *Murphy*, 663 F.2d 1004, 1008–1009 (10th Cir. 1981) (although evidentiary hearing at which both sides introduced testimony, documentary evidence and arguments was adequate procedure for determining competency of defendant, underlying investigation of defendant's competency was not adequate); *Slawson* v. *State*, 796 So. 2d 491, 502 (Fla. 2001) (evidence presented at competency hearing was "properly subjected to adversarial testing in an evidentiary hearing"). These cases establish only that, after a showing of evidence of incompetence sufficient to require a competency hearing has been made, an adversarial hearing is required.

evidentiary hearing to establish standing only upon a showing of meaningful evidence that the defendant is incompetent.

The plaintiff in error did not argue in its brief that it had presented meaningful evidence that the defendant is incompetent and conceded at oral argument before this court that it had not presented such evidence because the trial court had never ordered it to do so and it believed that it would be required to present such evidence at the competency hearing itself. Upon careful review of the record, we believe that the plaintiff in error had numerous opportunities to present evidence in support of its claim and failed to do so. In light of that failure, we conclude that the trial court properly determined that the plaintiff in error was not entitled to participate as a next friend in the defendant's competency hearing.

As we have indicated, however, despite the plaintiff in error's failure to offer meaningful evidence of the defendant's incompetence in a timely manner, we provided it with an opportunity to present a written offer of proof to this court detailing such evidence. We conclude that the offer of proof submitted by the plaintiff in error did not constitute meaningful evidence of the defendant's incompetence. Much of the proposed evidence had been provided to Norko and was addressed by him in his report and testimony. Norko recognized that the defendant had depressive symptoms, a history of suicide attempts and moments of intense anxiety and emotion. He also was aware that the defendant appeared occasionally to be emotionally drained, had doubts that his actions would bring any comfort to the victims' families and was occasionally ambivalent about his decision. Norko concluded that these feelings were normal for a person in the defendant's position and did not mean that he was incapable of making a rational choice. In addition, Norko was aware that the defendant

would prefer a sentence of life imprisonment to death, but did not want a new penalty phase hearing. With respect to Nave's proposed testimony and the proposed testimony of the defendant's father suggesting that the defendant suffered from delusions of importance and extreme narcissism, Norko recognized that the defendant suffered from a personality disorder with narcissistic traits but concluded that the disorder did not affect his ability to make a rational decision. With respect to the public defenders' claims that the defendant did not understand his legal options, the trial court extensively canvassed the defendant on that issue and reasonably found otherwise.

We also conclude that Grassian's proposed testimony on the effect of segregated confinement on the defendant's ability to make a rational and voluntary choice is speculative. Grassian has neither examined the defendant nor inspected the conditions of the defendant's confinement. Norko stated in his report that the defendant has frequent visitors in prison, corresponds with numerous people and regularly prays, reads, listens to music, watches television and does puzzles and word games. Norko also found that, although the defendant occasionally suffered from some of the symptoms listed by Grassian, he generally slept well, had a normal appetite and a good energy level, was able to concentrate and to process thought, had no memory disturbances and expressed no suicidal thoughts. Moreover, Grassian's proposed testimony that Norko had failed to recognize that the defendant's intelligence would allow him to conceal a "hidden agenda" is not supported by the record. Norko specifically stated in his report that the defendant "has hidden things from the [prison's mental health] staff in the past . . . ." He further stated that Chaplin "has tried to look through the surface, but does not see any significant concerns." For similar reasons, we conclude that Goldsmith's proposed testimony that

the defendant's decision is not voluntary is speculative and not supported by the record. Finally, we conclude that much of the proposed testimony by many of the witnesses is conclusory in that it suggests that the defendant's decision to take control of his fate by forgoing further legal challenges to his death sentences and his ambivalent feelings over the consequences of that decision are, in and of themselves, evidence of his incompetence. We see no basis for that proposition in logic, experience or the law.

We conclude that the plaintiff in error has not presented any meaningful evidence that the defendant is incompetent within the meaning of *Demosthenes* v. *Baal*, supra, 495 U.S. 734–35. In the absence of such evidence, the plaintiff in error is not entitled to an evidentiary hearing at which it may attempt to establish the defendant's incompetence and its standing to appear as the defendant's next friend under *Whitmore* v. *Arkansas*, supra, 495 U.S. 161–66. Accordingly, we agree with the trial court that the plaintiff in error's motion to appear as the defendant's next friend should be denied.

### III

We next address the plaintiff in error's claim that the trial court abused its discretion by denying its motion to appear as an amicus curiae. We disagree.

"The [a]ppearance of an amicus curiae is generally authorized by the court's grant of an application for the privilege of appearing as amicus curiae and not as of right. Accordingly, the fact, extent and manner of an amicus curiae's participation is entirely within the court's discretion and an amicus curiae may ordinarily be heard only by leave of the court." (Internal quotation marks omitted.) *Thalheim* v. *Greenwich*, 256 Conn. 628, 644, 775 A.2d 947 (2001); see also *National Organization for Women, Inc.* v. *Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000) ("[w]hether to permit a nonparty to submit a

brief, as amicus curiae, is, with immaterial exceptions, a matter of judicial grace"); *United States* v. *Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) ("[c]lassical participation as an amicus to brief and argue as a friend of the court was, and continues to be, a privilege within 'the sound discretion of the courts'"). Accordingly, we review the trial court's denial of an application to appear as amicus curiae for abuse of discretion.

"Historically, amicus curiae was defined as one who interposes in a judicial proceeding to assist the court by giving information, or otherwise, or who conduct[s] an investigation or other proceeding on request or appointment therefor by the court. . . . Its purpose was to provide *impartial* information on matters of law about which there was doubt, especially in matters of public interest. . . . The orthodox view of amicus curiae was, and is, that of an *impartial* friend of the court—*not an adversary party in interest in the litigation.* . . . The position of classical amicus in litigation was not to provide a highly partisan account of the facts, but rather to aid the court in resolving doubtful issues of law." (Citations omitted; emphasis in original; internal quotation marks omitted.) *United States* v. *Michigan*, supra, 940 F.2d 164–65. "Amicus . . . has never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest . . . and amicus has been consistently precluded from initiating legal proceedings, filing pleadings, or otherwise participating and assuming control of the controversy in a totally adversarial fashion. . . . Historically, an amicus could not join issues not joined by the parties in interest . . . ." (Citations omitted.) Id., 165.

The plaintiff in error has not cited a single authority directly supporting its argument that a court is required to grant a request to appear as amicus curiae if the parties to a proceeding have taken nonadversarial posi-

tions on an issue on which the person seeking to be admitted as an amicus curiae takes an opposing view.[18] The foregoing principles make it clear that the court has no obligation to do so. It is also clear that the plaintiff in error is attempting to use the procedure for becoming an amicus curiae as a vehicle for evading the procedures for formally intervening in the underlying criminal cases. Amicus status should not be granted for such a purpose. See id., 165–66. Accordingly, we conclude that the trial court did not abuse its discretion in denying the plaintiff in error's request to appear as an amicus curiae.

The orders of the trial court denying the plaintiff in error's motion to appear as the defendant's next friend and its request to appear as amicus curiae are affirmed and the writ of error is dismissed.

In this opinion VERTEFEUILLE, ZARELLA, LAVERY and FOTI, Js., concurred.

NORCOTT, J., concurring. Despite my long-standing belief that the death penalty has no place whatsoever in a civilized and rational criminal justice system,[1] I

[18] The cases cited by the plaintiff in error hold only that a court *may* appoint an amicus curiae to take the position that a defendant who has waived further challenges to his death sentence is incompetent to do so. See *Dennis ex rel. Butko* v. *Budge*, 378 F.3d 880, 903 (9th Cir.) (Berzon, J., concurring), cert. denied, 542 U.S. 959, 125 S. Ct. 16, 159 L. Ed. 2d 847 (2004), citing *Mason ex rel. Marson* v. *Vasquez*, 5 F.3d 1220, 1221 (9th Cir.), aff'd, 1 F.3d 964 (9th Cir. 1993) (en banc); *Comer* v. *Stewart*, 230 F. Sup. 2d 1016, 1019 (D. Ariz. 2002); *State* v. *Dodd*, 120 Wash. 1, 10, 838 P.2d 86 (1992). It cites no authority in support of its argument that the eighth amendment requirement for heightened reliability in death penalty cases *requires* the appointment of an amicus curiae in such cases.

[1] See *State* v. *Peeler*, 271 Conn. 338, 464, 857 A.2d 808 (2004) (*Katz, J.,* with whom *Norcott, J.,* joins, dissenting); *State* v. *Ross*, 269 Conn. 213, 392–93, 849 A.2d 648 (2004) (*Norcott, J.,* dissenting); *State* v. *Breton*, 264 Conn. 327, 446–49, 824 A.2d 778 (*Norcott, J.,* dissenting), cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Webb*, 252 Conn. 128, 147, 750 A.2d 448 (*Norcott, J.,* dissenting), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); *State* v. *Griffin*, 251 Conn. 671, 742–48, 741 A.2d 913 (1999) (*Norcott, J.,* dissenting); *State* v. *Ross*, 251 Conn. 579,

agree with the reasoning and conclusion of the majority opinion as limited to the context of this particular case, namely, the issue of standing with respect to the plaintiff in error, the office of the chief public defender of the state of Connecticut, as next friend of the defendant, Michael B. Ross. I write separately because our order will indirectly, but inexorably, lead in a matter of days to the death of the defendant at the hands of the state. This troubles me because of legitimate claims, still unresolved, that our death penalty system is administered in a racially discriminatory, arbitrary or capricious manner.[2] See *State* v. *Cobb*, 234 Conn. 735, 738 and n.4, 663 A.2d 948 (1995) (discussing preliminary data). Indeed, a comprehensive statistical study about the influence of race and other factors in the application of Connecticut's death penalty presently is ongoing in the context of consolidated habeas corpus litigation that is being supervised by a special master, former Chief Justice Robert Callahan. See *State* v. *Reynolds*, 264 Conn. 1,

597, 742 A.2d 312 (1999) (*Norcott, J.*, dissenting); *State* v. *Cobb*, 251 Conn. 285, 543–52, 743 A.2d 1 (1999) (*Norcott, J.*, dissenting), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 566–70, 680 A.2d 147 (1996) (*Norcott, J.*, dissenting); see also *State* v. *Rizzo*, 266 Conn. 171, 313–14, 833 A.2d 363 (2003) (*Norcott, J.*, concurring); *State* v. *Courchesne*, 262 Conn. 537, 583–84, 816 A.2d 562 (2003) (*Norcott, J.*, concurring).

[2] I previously have noted the "pervasive and insidious influence of race and poverty in the administration of the death penalty." *State* v. *Breton*, 264 Conn. 327, 447, 824 A.2d 778 (*Norcott, J.*, dissenting), cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); see also *State* v. *Cobb*, 251 Conn. 285, 545–46, 743 A.2d 1 (1999) (*Norcott, J.*, dissenting) ("I am convinced that the arbitrariness inherent in the sentencer's discretion is intensified by the issue of race. Indications from the available evidence suggest that the death penalty has been imposed in a racially discriminatory manner and has been geared toward minorities and the poor."), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 566–67, 680 A.2d 147 (1996) (*Norcott, J.*, dissenting) ("I am persuaded that our statutory scheme for its imposition cannot withstand constitutional scrutiny because that scheme, by its very nature, admits of an unacceptable opportunity for arbitrariness and the influence of racial discrimination to operate in the determination of who shall die at the hands of the state").

232–33, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also General Statutes § 53a-46b (b) (1) ("[t]he Supreme Court shall affirm the sentence of death unless it determines that . . . [t]he sentence was the product of passion, prejudice or any other arbitrary factor").[3] My concern is that

[3] In *State* v. *Cobb*, supra, 234 Conn. 738–39 n.4, which was decided in 1995, the defendant produced preliminary data and contended that race has an impermissible effect on capital sentencing because: "(1) since 1973, prosecutors have charged a capital felony pursuant to General Statutes § 53a-54b in seventy-four cases, of which only eleven, or 15 percent, have involved the murder of a victim who was black, even though 40 percent of all murder victims in the state during that same time period were black; (2) since 1973, although there have been eighteen capital prosecutions for murder committed during the course of kidnapping, none was prosecuted where the victim was black; (3) during the same period, there have been twelve capital prosecutions for murder committed in the course of a sexual assault, and only one involved the murder of a black victim; (4) since 1973, twenty-eight cases have resulted in a conviction of capital felony, by verdict or plea, and eighteen of those twenty-eight have proceeded to a hearing on the imposition of the death penalty. Of the twenty-eight capital felony convictions, only four, or 14 percent, have involved the murder of a victim who was black, and of the eighteen that have gone to a penalty phase hearing, only one, or 5.5 percent, has involved the murder of a black victim; (5) of the sixty-six capital convictions in which the guilt phase has been concluded, twenty-one involved black defendants and forty-five involved nonblack defendants. Of the black defendants, thirteen of twenty-one, or 62 percent, were convicted of capital felonies and fifteen of forty-five, or 33 percent, nonwhite defendants were so convicted." He sought "the opportunity to demonstrate the number of kidnap murders of black victims and the number of sexual assault murders of black victims that were not prosecuted as capital felonies and to demonstrate the disproportionate treatment of those crimes as compared to the treatment of comparable crimes involving white victims." Id.

Because of the need for the creation of an adequate factual record as to alleged discrimination, this court concluded that the defendant's claim in *Cobb* was more appropriately raised collaterally via a habeas corpus proceeding, rather than a remand from direct appeal. Id., 741. Data collection and analysis by the public defenders commenced shortly thereafter, and in *State* v. *Reynolds*, supra, 264 Conn. 233, this court ordered that the *Cobb* and *Reynolds* racial discrimination claims "be litigated before the same habeas judge and in the same general, consolidated hearing, on behalf of all defendants who have been sentenced to death." In December, 2002, Chief Justice William J. Sullivan appointed former Chief Justice Robert Callahan as special

to permit an execution to proceed without the benefit of the completion of that study and a ruling thereon amounts to an informal and premature judicial imprimatur on the fairness of the death penalty process. Moreover, should the habeas court subsequently conclude that our entire death penalty system is fundamentally flawed as discriminatory on the basis of race *after* the defendant has been executed, our citizens' confidence in this court and the rest of the judicial branch as a bastion of civil rights might suffer irreparable harm.[4] My reservations aside, I nevertheless concur in the instant judgment because this issue was not addressed in this writ of error.

DRANGINIS, J., concurring. I agree with the majority that the plaintiff in error, the office of the chief public defender of the state of Connecticut, cannot participate as next friend of the defendant, Michael B. Ross, or as amicus curiae in postconviction proceedings in the cases against the defendant. I also fully agree, however, with Justice Norcott that the pending consolidated habeas corpus litigation regarding the influence of race in the application of our death penalty statute raises the prospect that the imminent imposition of the death penalty in this case will be revealed, in the foreseeable

---

master to manage the litigation, including the preparation and submission of the state's response. Id.

[4] It is of no consequence that the defendant in the present case and his victims are white, and that there is no question as to his guilt, or that his acquiescence to the death penalty is competent, knowing and voluntary. My trepidation transcends the defendant in this case because our concerns of racial discrimination in the administration of Connecticut's death penalty are not the product of conjecture informed by the voracious consumption of law review articles. Rather, a court supervised statistical analysis of our capital sentencing scheme, from intake to disposition, is in actual progress. The preliminary statistical data has revealed allegations of racial disparity that are substantial enough to require years of analysis under the supervision of a special master. I find profound the implications of knowingly using a death penalty process that plausibly may well be seriously flawed as discriminatory on the basis of race.

future, as having resulted from a fundamentally flawed system. I concur separately only because, unlike Justice Norcott, I do not believe the death penalty to be unconstitutional in all situations.